**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jerry M. SOYLAND, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Mary E. WHITAKER, Defendant–Appellant.**

**Nos. 91–50581, 91–50583.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1992.

Decided Sept. 2, 1993.

Gerald T. McFadden, San Diego, CA, for defendant-appellant Soyland.

Knut S. Johnson, Asst. Federal Public Defender, San Diego, CA, for defendant-appellant Whitaker.

Timothy Coughlin, Asst. U.S. Atty., San Diego, CA, for plaintiff-appellee U.S.

Before: BEEZER, KOZINSKI and KLEINFELD, Circuit Judges.

BEEZER, Circuit Judge:

Mary E. Whitaker and Jerry M. Soyland appeal their convictions for conspiracy and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Both defendants appeal their sentences. We have jurisdiction under 28 U.S.C. § 1291. We affirm Whitaker's convictions and vacate and remand her sentence. We reverse Soyland's convictions.

## I

On October 14, 1990, Whitaker and Soyland were travelling in a hatchback vehicle that had bags and boxes piled in the back. Whitaker was the driver, Soyland the passenger. When the vehicle reached an immigration checkpoint, agent Van Gorder directed Whitaker to drive to the secondary inspection area. As Whitaker exited the vehicle to open the hatchback door, agent Boubel smelled methamphetamine. He did not smell the drug again. Boubel completed the immigration inspection upon assuring himself that no one was hiding in the hatchback area.

Suspecting the presence of methamphetamine, Boubel requested and received permission from Whitaker to search the automobile. Boubel found vitamin B powder, which can be used to dilute narcotics, and about $4000 in cash. In response to Boubel's questioning about illegal drugs in the vehicle, Whitaker admitted that her cigarette pack held two marijuana cigarettes. Another vehicle search revealed a third marijuana cigarette, about $600 in cash and a pipe containing marijuana residue.

Boubel asked Soyland to empty his pockets, and Soyland produced about forty cents. Boubel patted Soyland down and located approximately 220 grams of methamphetamine. Whitaker and Soyland were arrested, and a search of Whitaker's purse produced a small electronic scale.

## II

Soyland argues the methamphetamine should have been suppressed because he was searched without probable cause. We review *de novo* whether probable cause supported the search. *United States v. Dunn*, 946 F.2d 615, 618 (9th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 401, 116 L.Ed.2d 350 (1991).

 Soyland, the passenger, was searched without probable cause. There was not a sufficient link between Soyland and the odor of methamphetamine or the marijuana cigarettes, and his "mere presence" did not give rise to probable cause to arrest and search him. *See United States v. Robertson*, 833 F.2d 777, 782 (9th Cir.1987). Suppression of

the unlawfully obtained evidence requires reversal of Soyland's convictions.

## III

Whitaker argues several bases for reversing her convictions. These contentions lack merit.

### A

 Whitaker maintains the referral to secondary inspection was improper because it was made without "reasonable suspicion." Because reasonable suspicion is not necessary, Van Gorder properly referred the vehicle whether or not she suspected an immigration violation. *United States v. Barnett*, 935 F.2d 178, 180–81 (9th Cir.1991).

 Whitaker does not argue and no objective evidence demonstrates Van Gorder, or the Border Patrol in establishing the checkpoint, intended to search for illegal drugs under the pretext of searching for undocumented aliens. Specifically, nothing in our careful review of the record suggests that narcotics training of Border Patrol agents has resulted in anything other than agents who, during the course of a lawful immigration search, have the ability to discern the presence of illegal drugs. Here, Boubel smelled methamphetamine while preparing to search a cluttered area of Whitaker's vehicle for undocumented aliens. After smelling methamphetamine, Boubel properly detained Whitaker and obtained her valid consent to search the vehicle. *United States v. Preciado–Robles*, 964 F.2d 882, 884 (9th Cir.1992).

Whitaker has never contended that Boubel, Van Gorder or anyone else had special incentives to uncover a narcotics violation, and any such notion is utterly without support in the record. No matter how vital, contentious or interesting an issue such a fact pattern might present, the judicial process requires us to abstain from entering into conjectural fact finding. We will not contribute to the chaos created by deciding questions not first presented at trial. We have no occasion to address the issue of whether checkpoint officers routinely overstep their authority by conducting pretextual narcotics searches. *See Shelley v. Kraemer*, 334 U.S.

1, 8–9, 68 S.Ct. 836, 839–40, 92 L.Ed. 1161 (1948) (unless previously raised, constitutional issue not properly before appellate court).

## B

■ Whitaker argues evidence relating to her prior drug arrests should not have been admitted because the evidence is not sufficiently similar to her conduct here. She also contends the district court failed to balance probative value against prejudicial effect before admitting the evidence.

Both prior arrests involved the odor of illicit drugs emanating from Whitaker's automobile and the finding of methamphetamine in the vehicle together with large amounts of cash. One arrest uncovered a scale and other drug paraphernalia. The record shows the district court weighed the probative value of the evidence against its prejudicial effect. The court did not abuse its discretion by admitting the evidence. *United States v. Hill*, 953 F.2d 452, 455 (9th Cir.1991).

## C

Whitaker argues that insufficient evidence supports her convictions. We disagree.

■ Viewing the evidence in the light most favorable to the government, the jury not only could have reasonably inferred that Whitaker and Soyland had agreed to distribute methamphetamine, but also that the large sum of cash found in the automobile evidenced purchases or sales incident to the distribution. The circumstances of Whitaker's prior drug arrests, the similarity of those circumstances to the situation here and that small change was the only money Soyland possessed further support the inference that Whitaker had control over the methamphetamine Soyland carried. *United States v. Disla*, 805 F.2d 1340, 1350 (9th Cir.1986). The jury acted rationally by convicting Whitaker. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

## IV

Whitaker argues that the amounts of methamphetamine involved in her prior drug arrests should not have been considered in determining her base offense level. We re-

view *de novo* the application of law in our review of Whitaker's sentence. *United States v. Hahn*, 960 F.2d 903, 907 (9th Cir. 1992).

■ Before Whitaker's prior acts can constitute "relevant conduct," *Hahn*, which was decided after Whitaker was sentenced, requires that the government show in "sufficient proportions" the similarity, regularity and temporal proximity of the prior acts to her conduct here. U.S.S.G. § 1B1.3(a)(2) (Nov.1990); *Hahn*, 960 F.2d at 911. Because the record does not contain the required findings, we vacate Whitaker's sentence. On remand, the district court shall determine whether the prior acts are "relevant conduct" and recompute the imprisonment term.

■ Whitaker also contends she is unable to pay the assessed $25,000 fine. She refused to provide financial information to the probation officer and thus failed to carry the burden of showing an inability to pay the fine. U.S.S.G. § 5E1.2(f); *United States v. Rafferty*, 911 F.2d 227, 232–33 (9th Cir.1990). If the relevant conduct determination made on remand produces the same offense level, then Whitaker is not entitled to recomputation of her fine. If a change in the offense level causes her to be at a lower point in the fine table, then her fine should be recomputed.

Whitaker's convictions are AFFIRMED, and her sentence is VACATED and REMANDED. Soyland's convictions are REVERSED.

KOZINSKI, Circuit Judge, dissenting as to Parts III(A) and (C).

Fifty million vehicles a year pass through the Temecula and San Clemente checkpoints, which straddle the two major arteries connecting San Diego and Los Angeles about 70 miles inside U.S. territory. It's quite an experience: Every car, van, truck and coach heading north is slowed to a crawl so uniformed law enforcement officers can peer inside for . . . you're not exactly sure what. If the officers think you're worth investigating, they pull you over, question you and look

inside your car. They alone decide whether a more thorough search will follow.

In *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Supreme Court approved such internal checkpoints as a necessary means of stemming the flow of undocumented aliens. Experience has shown, however, that the checkpoints yield a far richer harvest—a cornucopia of contraband, particularly illegal drugs.[1] Perhaps this is an accident—just a lot of lucky breaks on the part of the Border Patrol. But it may be much more: There's reason to suspect the agents working these checkpoints are looking for more than illegal aliens. If this is true, it subverts the rationale of *Martinez–Fuerte* and turns a legitimate administrative search into a massive violation of the Fourth Amendment.

A. Administrative searches are an oddity of Fourth Amendment jurisprudence. They involve judicially-approved searches and seizures of countless people and places, with no particularized suspicion and normally without a warrant. To justify such a wholesale exemption from ordinary Fourth Amendment requirements, the government must establish two critical elements: first, that there's a compelling need for the intrusion; and second, that the intrusion is strictly limited to fulfilling that need. *United States v. $124,-*

*570 U.S. Currency (Campbell),* 873 F.2d 1240, 1244–45 (9th Cir.1989).

Security checks at airports and public buildings,[2] sobriety checkpoints,[3] safety inspections of private homes and businesses,[4] home visits by welfare caseworkers,[5] agricultural quarantine checks at airports,[6] investigations following a fire,[7] drug testing of certain public employees,[8] unannounced inspections of businesses in closely regulated industries[9]—all of these and many more have been upheld under an administrative search rationale. What this means is that government officials routinely invade the privacy and property of countless millions; hardly anyone escapes their clammy grasp.

With this power comes a vast potential for abuse. The Supreme Court has therefore "repeatedly emphasized the importance of keeping criminal investigatory motives from coloring administrative searches." *Id.* at 1244. We too have stressed the need to keep these searches from becoming "infected by general law enforcement objectives, and the concomitant need for the courts to maintain vigilance." *Id.; see Davis,* 482 F.2d at 909. These judicial admonitions are fueled by the fear that, if not carefully circumscribed and monitored, administrative searches can destroy the promise of the Fourth Amendment.

Consider building inspections. A city may—without particularized suspicion—send inspectors into private homes to check for housing code violations. *Camara,* 387 U.S. at 538, 87 S.Ct. at 1735. It may do so,

1. *See, e.g.,* in 1992 alone, *United States v. Reinhardt,* 980 F.2d 740 (9th Cir.1992) (table); *United States v. Reynolds,* 979 F.2d 857 (9th Cir.1992) (table); *United States v. Koshnevis,* 979 F.2d 691 (9th Cir.1992); *United States v. Williams,* 977 F.2d 594 (9th Cir.1992) (table); *United States v. Morales,* 972 F.2d 1007 (9th Cir.1992); *United States v. Bowers,* 967 F.2d 592 (9th Cir.1992) (table); *United States v. Cortes,* 967 F.2d 592 (9th Cir.1992) (table); *United States v. Preciado–Robles,* 964 F.2d 882 (9th Cir.1992); *United States v. Ponce–Rodriguez,* 963 F.2d 381 (9th Cir.1992) (table)—all drug cases coming from an immigration checkpoint.

2. *United States v. Davis,* 482 F.2d 893 (9th Cir. 1973); *McMorris v. Alioto,* 567 F.2d 897 (9th Cir.1978).

3. *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990).

4. *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).

5. *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971).

6. *United States v. Schafer,* 461 F.2d 856 (9th Cir.1972).

7. *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978).

8. *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).

9. *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (auto junkyards); *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (underground and surface mines); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (firearms and ammunition dealers); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (liquor licensee).

however, only if "the inspections are neither personal in nature nor aimed at the discovery of evidence of crime...." *Id.* at 537, 87 S.Ct. at 1735. Suppose one sunny day the City of Los Angeles decides to give its building and safety inspectors general law enforcement training. As part of this program, they are taught the smell of certain illegal drugs, how to spot illegal weapons and illicit gambling operations. Each inspector is given a buddy on the police force whom he is to call if he finds evidence of criminal activity while rummaging through people's homes. The city rewards and promotes inspectors for assisting with police investigations. Such a program would make a lot of sense from a law enforcement perspective, but it would surely be incompatible with the Supreme Court's rationale in *Camara*.

Of course, if a safety inspector happens to see a dead body in someone's living room during a routine inspection, it's fine for him to tell the police. But the closer the working relationship between the police and the inspector, and the more the inspector sees sleuthing as part of his mission—as a way to advance his career—the more he'll be tempted to stretch his inspection beyond what safety alone calls for. The inspector may then be just as likely to conduct a "routine" building inspection not because of safety code procedures or tenant complaints, but to help the police figure out what's going on inside.

Or take the case of sobriety checkpoints. In *Michigan v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the Supreme Court held that the police can stop traffic on public streets and highways, observe drivers and briefly question them. Those who look intoxicated are then pulled over and tested.

Suppose the California Highway Patrol and the DEA hatch a plan to use drunk-driving checkpoints in the war against drugs: CHP officers agree to set up the checkpoints at freeway entrances the DEA believes are frequented by drug couriers, and the DEA gives the CHP officers drug courier profiles and trains them to scan drivers and passengers. Suppose there is also a tacit understanding that, in making the highly discretionary decision about whom to pull over and test, CHP officers consider whether anyone in the car fits a DEA profile, whether the car

is popular with drug dealers, and a variety of other factors that point to drug dealing. While these sobriety stops might look exactly like those approved in *Sitz*, the effort to use them for unrelated law enforcement purposes would fatally undermine the Supreme Court's rationale in that case.

That this is more than idle speculation is the lesson of *United States v. $124,570 U.S. Currency (Campbell)*, 873 F.2d 1240 (9th Cir. 1989). The case involved a bundle of cash found during a search of an airline passenger's hand luggage. We had previously approved such security checks under an administrative search rationale, subject to the express condition that they not be used for general law enforcement purposes. *Davis*, 482 F.2d at 911–12.

The U.S. Customs Service and the Seattle Port Police nevertheless adopted a program of rewarding Flight Terminal Security (FTS) agents for finding drugs or large sums of money, and the FTS adopted a policy of reporting such finds. *Campbell*, 873 F.2d at 1245 & n. 3. We held that the administrative search had been tainted:

> If the officers have only one objective— detecting firearms and explosives—we can safely defer to their judgment, as they would have no reason to open packages unless they contained something potentially dangerous. It is much different where the agents have a dual objective; the decision to open a particular briefcase may be motivated by the desire to comply with the FTS's cooperation policy. Particularly zealous agents may choose to open packages more often, hoping to improve their chances of earning a reward.

*Id.* at 1245. We noted the FTS's policy would "very likely influence FTS officers to conduct more searches, and more intrusive searches, than if they focus[ed] on air safety alone." *Id.* The melding of these interests, we held, "effectively transform[ed] a limited check for weapons and explosives into a general search for evidence of crime. This substantially erod[ed] the privacy rights of passengers who travel through the system." *Id.* at 1246.

*Campbell* illustrates that administrative searches are to law enforcement what a pot

of maple syrup is to honeybees. In earnest pursuit of their mission—and probably with no intention of stepping beyond the bounds of propriety—law enforcement officials will try to get as much as they can from the permitted intrusion. The immigration checkpoints at Temecula and San Clemente are as susceptible to this abuse as the security checks in *Campbell.* As we noted there, "a sieve through which pass the contents of billions of satchels, purses, briefcases and pockets will naturally strain out much that is of interest to law enforcement." *Id.* So too it is with the contents of tens of millions of vehicles that travel from San Diego to Los Angeles.

B. *Martinez–Fuerte* approved immigration checkpoints for a very narrow purpose—detecting, and thereby deterring, illegal immigrants. But, as in *Campbell,* the record here suggests that these checkpoints may also be serving broader law enforcement objectives.

Consider just how knowledgeable about drugs were the Border Patrol agents in this case. Agent Van Gorder, who sent Soyland and Whitaker to secondary, testified that her Border Patrol training included cross-training by DEA and Customs. RT 1/25/91 at 33. And that training seems to have paid off: Illegal drugs were found in one of every eight cars she had referred to secondary. *Id.* at 29. Agent Boubel, who conducted the search and arrested Soyland and Whitaker, had been trained to recognize whether someone is under the influence of drugs; he'd also been taught a lot about methamphetamine—its odor, how it's manufactured and how it's likely to be transported. *Id.* at 88–89. While at Temecula, Agent Boubel had smelled methamphetamine over a hundred times and found it every time he'd smelled it in a car. Appendix, *infra,* at 1324. He also recognized vitamin B powder as a substance

commonly used to dilute narcotics. *Id.* at 1321.

Consider also what happened to Soyland and Whitaker once they got to secondary. The immigration check of their vehicle was brief, which is not surprising given that a Mazda RX–7 is hardly suitable for transporting aliens; Agent Boubel didn't even bother verifying Soyland and Whitaker's citizenship. Instead, he spent most of his time conducting what he himself described as a *drug* investigation, *id.* at 1321—examining such things as the contents of a plastic bag, a cigarette pack and the pockets of a jacket, *id.* at 1321–1322. In Agent Boubel's own words: "I had smelled the smell that I identified as methamphetamine. I had seen the package on the floor that, in my experience, is consistent with other drug apprehensions that I have made at the checkpoint. So, at that point, I decided that I would ask [Whitaker] for permission to search the interior of the vehicle for any possible illegal drugs." *Id.* at 1321.[10]

Now if a Border Patrol agent stumbles across a brick of marijuana as he's checking for aliens, it would be perfectly okay for him to turn the occupants over to the DEA, just as it would be fine for the building inspector to report the cadaver in the living room. But it's a different matter when the Border Patrol agent conducts a separate investigation after he's established there are no immigration law violations, particularly if he's been trained to detect the smells of various drugs, instructed to follow his nose to their origin and given an incentive to do so. And it's a different matter still if the agent who makes the infinitely malleable judgment about whom to pull over to secondary is thinking not just about aliens, but also about drugs, guns, uninspected produce or other contraband he might find. Discovery of such contraband then is no longer an accident; it is a systematic wrenching of the administrative search from its constitutional roots.[11]

---

**10.** Excerpts of Agent Boubel's testimony are reproduced in the Appendix to this dissent. Interested readers can make up their own minds whether this is someone who considers drug inspections a routine part of his job.

**11.** An explicit policy may not be necessary to taint these checkpoints. It may suffice if there is a tacit policy, if Department of Justice officials in charge of the checkpoints are aware that field agents regularly use the checkpoints for general

law enforcement. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 130, 108 S.Ct. 915, 927, 99 L.Ed.2d 107 (1988) (plurality opinion) (potential section 1983 liability "if a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware"); *Gillette v. Delmore,* 979 F.2d 1342, 1349 (9th Cir.1992) (custom or informal policy may be proven through "evidence of repeated constitutional violations for which the errant municipal officials were not discharged or repri-

My colleagues look at the record here and find my concerns "utterly without support." Majority at 1314. Reasonable minds can differ, I suppose, but I have much difficulty reading the testimony of Agent Boubel, for example, and concluding that looking for drugs wasn't a big part of the job as he understood it. His search for immigration violations was entirely perfunctory. *See* Appendix, *infra,* at 1320–1321. But one is thoroughly impressed by his dogged determination in pursuing the smell of methamphetamine, his eagerness to spot drug-dealing activity from clues most people would look right past, his willingness to arrest the suspects for three marijuana cigarettes, *id.* at 1327—a quantity so small the State of California treats its possession like a minor traffic infraction. Cal.Vehicle Code § 23222.[12] Such a gung-ho attitude is commendable in public servants, but not in conducting administrative searches.

C. "Liberty—the freedom from unwarranted intrusion by government—is as easily lost through insistent nibbles by government officials who seek to do their jobs too well as by those whose purpose it is to oppress; the piranha can be as deadly as the shark." *Campbell,* 873 F.2d at 1246 (footnote omitted). As federal judges we have a duty to safeguard the constitutional rights of our citizens from subtle as well as blatant overreaching by government officials. Where the record in a particular case, along with our past experience, *see* note 1 *supra,* suggests that law enforcement officials may be routinely overstepping their authority in conducting administrative searches, we have a special responsibility to inquire further. *See United States v. Redondo–Lemos,* 955 F.2d 1296, 1298 (9th Cir.1992).

I would therefore remand the case against Whitaker for a factual inquiry into whether the government officials who operate the Temecula and San Clemente checkpoints have remained faithful to their original purpose. This wouldn't be a particularly burdensome inquiry: It would involve only an objective examination of the operation of these checkpoints, not the motives of any particular official, making it far less intrusive than the inquiry we approved in *Redondo–Lemos.* The key question would be whether the checkpoints are being run as contemplated by *Martinez–Fuerte,* or whether the policies, programs, directives and incentives put in place by the government, or any customs and practices that have developed with the government's tacit approval, have turned Temecula and San Clemente into general law enforcement checkpoints.[13]

---

manded"); *Oviatt by and through Waugh v. Pearce,* 954 F.2d 1470, 1477 (9th Cir.1992)·(policymaker's inaction in face of problem constituted policy for purposes of section 1983 liability); *see also Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir.1985) (prior incidents of misconduct tend to prove a pattern or custom and policymaker's accession to it). While these cases arise in a somewhat different context, they provide an apt analogy to our situation. Because administrative searches are so easily diverted from their narrowly defined purposes, government officials have an affirmative responsibility to keep them from being misused. Acquiescence in a custom or practice that routinely disregards the limits of particular administrative searches might itself be sufficient to establish a breach of this responsibility.

12. That Agent Boubel considered drug violations not all that different from immigration violations might be gleaned from the following exchange on cross-examination:

> Mr. Johnson: Now, this is particularly true if you suspect someone might be involved in some sort of drug offense. You really want to make sure that they don't get away; is that right?

Agent Boubel: I don't see whether that would be any different whether it was drugs or aliens. A violation is a violation.

Appendix, *infra,* at 1326.

13. While we should rely on the parties and the district court to frame the precise questions on remand, the following would no doubt be relevant: Are the checkpoints staffed entirely by Border Patrol and other INS agents? If not, what other agents are normally present, in what numbers and for what purpose? Do the Border Patrol agents at the checkpoints get trained by the DEA and other law enforcement agencies? If so, is this the training given to Border Patrol agents generally, or is it checkpoint-specific? Do the agents get regular alerts from other law enforcement agencies as to what (other than aliens) to look for? Are the agents trained to recognize drug courier profiles and do they take these into account in deciding when to pull cars over to secondary and how thorough a search to conduct? Are the agents instructed to stop their inspection once they're satisfied there are no aliens, or are they encouraged to go further if they think they might find other contraband? Are the checkpoints regularly equipped for investigations into other contraband? *See, e.g., United States v. Taylor,* 934 F.2d 218, 219 (9th Cir.1991)

Given the strong hints that the Constitution is being routinely violated at these checkpoints, we owe it to ourselves and the public we serve to look into the matter. Even without an order of this court or the district court, the Department of Justice would be well-advised to establish the bona fides of these checkpoints by presenting such evidence to the district court on remand. "[T]he necessity to preserve individual rights ... in the course of investigations and prosecutions" is, after all, not the judiciary's burden alone. *Address by Attorney General Janet Reno to Justice Department Employees,* Fed. News Serv., Apr. 2, 1993.

## APPENDIX

### Excerpts from Testimony of United States Border Patrol Agent Ralph Boubel, 1/25/91, at 62–96.

#### Direct Examination:

Q Okay. And can you then tell us what occurred?

A Okay. Again, I identified myself as a Border Patrol agent. I asked the two subjects in the vehicle if they were United States citizens, and they both answered, "Yes."

Q Then, what happened?

A Okay. I asked the driver if I could have a look in the back of the vehicle.

Q And why did you ask the driver that?

A To make sure that there was nobody hiding under the—stuff that was in the back.

Q Okay. Then, what occurred?

A Okay. She said, "Yes." And I asked her to exit the vehicle and open the back for me and, as she stepped out of the

vehicle, I smelled the smell that I identified from past experience as the smell of methamphetamine in the vehicle.

. . . .

Q All right, okay. Anything else unusual strike you, as she got out of the vehicle?

A Well, as she stepped out of the vehicle, I—I looked into the interior of the vehicle and, on the floor, on the passenger side, was a circular—a container. It looked like a plastic bag from a grocery store, something in a circular-type arrangement.

Q Then, what occurred after she got out of the vehicle?

A Okay. Again, I had asked her to open the back of the vehicle, and she walked to the back of the vehicle and opened it up.

. . . .

Q And can you describe what the rear looked like to you?

A The rear of the vehicle itself?

Q Correct.

A Okay. It's—it's got a hatchback, and the hatchback had black louvers on it so that you couldn't see through the window.

Q And could you see into the rear of the vehicle at all?

A The only way—

Q Standing in back?

A The only way I saw into the rear of the vehicle was through the side window.

Q And could you see through the vehicle to the other side, looking through the side window?

A No, sir. There was—there were a lot of objects in there; seemed to be very cluttered.

(San Clemente Border Patrol agent used dog trained to alert to drugs and people); *United States v. Perez,* 936 F.2d 581 (9th Cir.1991) (table) (Temecula Border Patrol agent used dog trained to alert to drugs and people). Does the Border Patrol have a policy of rewarding agents who uncover contraband other than aliens? Are the position descriptions, performance goals and other standards for measuring the conduct and performance of Border Patrol agents at Temecula and San Clemente keyed to detecting illegality other than aliens? Are agents frequently cross-designated as Border Patrol agents and Customs or DEA agents? *See, e.g., Taylor,* 934 F.2d at 219 (Border Patrol agent cross-designated as agent of DEA and Customs). In justifying budget and personnel resources for Temecula and San Clemente, does the Border Patrol rely on time and resources allocated to look for things other than aliens? Have the Border Patrol agents been adequately trained to respect the limits of these searches and admonished when they do not? *See* note 11 *supra.*

Q All right. After she opened the back, what occurred then?

A Okay. She opened the back, and I looked through—moved some of the things around to look underneath to make sure that there wasn't a person hiding underneath the packages and the things that were in the back.

Q And did you check in any other areas of the car that were in the back there?

A I just checked the area that was there, and I lifted up, I believe, the bottom to check the spare tire area that's underneath. Again, there were a lot of packages and stuff, a lot of stuff to move, but I assured there was nobody in there.

Q At that particular point, did you feel as though your Immigration inspection had been completed?

A Yes, sir.

Q What—at that particular point, what was still on your mind?

A Okay. Again, I had smelled the smell that I identified as methamphetamine. I had seen the package on the floor that, in my experience, is consistent with other drug apprehensions that I have made at the checkpoint. So, at that point, I decided that I would ask her for permission to search the interior of the vehicle for any possible illegal drugs.

Q And where did you ask that question?

A At the rear of the vehicle.

Q Did she close the hatchback at that point, or did you close the hatchback, or was it left open?

A She closed it, but I asked her not to close it all the way, just to leave it cracked.

Q Okay. And, in response to your question to consent, how—do you recall exactly how you phrased the question?

A Yes, sir. I asked her if she would mind if I had a look in the interior of the vehicle.

Q And her response was?

A She said, "Yes, go ahead."

Q And, then, what did you do? Which side did you go on first?

A Okay. I approached the vehicle on the passenger side, and I asked the passenger if he would exit the vehicle, so that I could get a better look inside the vehicle.

Q Now, do you recall the demeanor of both the driver and the passenger at that particular point?

A In my opinion, they seemed to be okay. They weren't nervous or—or—or too overanxious, or anything.

Q Okay. And what did you do then?

A Okay. At that point, I looked through the vehicle. I remembered the—the circular package on the floor. So, I picked it up to see what was in it.

Q And what did you find?

A Okay. It contained a brand new bottle of Super B powder, which is a Vitamin B Complex powder.

Q All right. Just stepping back to one particular point. How long did the Immigration inspection take, of the back of the vehicle—the first inspection you made to search for Immigration violations?

A Okay. Probably not more than a minute to a minute and a half.

Q Okay. And, then, after you got the permission to look into the interior of the vehicle, how long did that particular search take?

A The initial search probably lasted about four minutes.

Q Okay. And where did you look?

A Again, I picked up the bottle of the—initially, I went right to the package that was on the floorboard on the driver's side, and I picked it up to check what it was. Once I looked at it and saw what it was, I recognized it as—as a substance that I have encountered in the past being used as a cutting solution for illegal drugs.

Q All right. And where else did you search?

A Okay. I searched under the seats, in between the seats, the area of the back seats, and in the glove compartment of the vehicle.

Q And did you find anything that had significance to you?

A Okay. In the glove compartment of the vehicle, I found what looked like a bank bag, a zippered bank bag. And I opened it up to look in there, and it contained a large amount of cash.

Q All right. At that particular point, what did you do? After you had completed that particular consent search.

A Okay. I looked through the vehicle. I didn't find anything of illegal drug type. I found the money and the—and the powder. So, I still felt that there may be a drug violation here. At that point, since I hadn't found anything, I went to the driver, and asked her if she had any illegal drugs in the vehicle.

Q And what was her response?

A She told me that she might have two marijuana cigarettes in her cigarette pack, on the dashboard.

. . . .

Q And what did you do at that point?

A Okay. At that point, I went into the— to the car again, and got the cigarette pack, and looked in it, and found two marijuana cigarettes in there.

Q And what did you do after you found the marijuana cigarettes?

A Well, I looked in the car a little bit closer, and I found a third marijuana cigarette in one of the recessed holes in the center console of the vehicle.

Q Okay. Was there anything else in that hole?

A No, sir.

Q Just the marijuana cigarette?

A Yes, sir.

Q If you were seated in the passenger seat, would you have access to it?

A Yes, sir.

(Pause.)

Q How long did this further search, where you found the marijuana—third marijuana cigarette take?

A Okay. Once I found the marijuana cigarettes, I decided to search the vehicle closer, a second time. So, I probably took about eight to ten minutes to look through the whole vehicle, to look through all the packages and containers that were in the rear, and the entire vehicle, again, more thorough to make sure that I hadn't overlooked something.

Q And did you find anything else that was of significance to you?

A No, sir—well, I did find one jacket in the back seat area that had a—a large amount of cash in the pocket.

Q And did you ask any questions about the jacket?

A I found the cash in there, the large amount. So, I asked the driver if it was her jacket.

Q What did she say?

A She said no, it was not; that—that she deals in—in buying and selling merchandise, and that it must—the money must have been in the jacket when she bought it.

Q When you say a "large amount of cash," at that particular time did you count the money?

A Not at that particular time; no, sir.

Q Did you have an approximate idea of how much it seemed to be?

A It was several hundred dollars.

THE COURT: Is this—excuse me, I'm all confused—is this in addition to the large amount of cash that you had earlier found?

THE WITNESS: Yes, sir.

THE COURT: Okay.

(Pause.)

BY MR. COUGHLIN:

Q After finishing that more extended search, what did you do at that particular point?

A Okay. Since I had failed to—to find any drugs that had matched the smell that I had smelled earlier, I thought that it may be possible that the people may be holding it on their person.

Q Taking one step back, at any time during the searches that took place after that initial smell of methamphetamine, did you smell that again?

A No, sir, just the initial smell.

Q Now, the question is, after that extended search, what did you do?

A Okay. Again, like I said, I thought that they may be holding it on their

person, since we've had cases of that happening in the past. I asked the passenger, who had been standing outside the vehicle all this time, if he would come over and empty the contents of his pockets on the hood of the vehicle.

Q Do you recall what he was wearing?

A I believe he was wearing jeans and a light jacket.

Q Okay. And what did you do?

A Okay. He—I asked him to step over where I was, and he went through his jacket pockets, and he fumbled for what seemed like a long amount of time, you know, approximately 20 seconds or maybe a little longer, and he came out with just a little bit of change. I think it was, like, 35 cents or 40 cents in—in change.

Q And that was taken from his jacket pocket?

A From his jacket pocket.

Q Were both hands in his jacket pocket, or just one?

A I believe they were both in there, in both pockets.

Q Did he come out with anything in his other hand?

A No, sir.

Q What did you do at that point?

A I asked him if that was everything that was in his pockets, and he said, "Yes."

Q And, after he responded to that question, what did you do?

A Okay. I went ahead to give him a pat-down, to make sure that his pockets were empty, and that he wasn't carrying anything else that he—that he had refused to bring out.

Q At that particular point, were Ms. Whitaker and Mr. Soyland free to leave?

A No, sir.

Q And what did you find as you did the pat-down?

A Okay. Inside his jacket pocket, then, I—at this time, I can't recall whether it was the right or the left jacket pocket— he had a small plastic baggie that had a green, leafy substance, a small amount

of it, which I believed to be marijuana, and he had a small circular screw-type plastic container, which I opened up, and saw to contain a small amount of a white powdery substance.

Q Did you smell that?

A No, sir, I did not.

Q And, then, what did you do?

A Okay. I—I patted him down the rest of his body to check, you know, his—his pants pockets, and—and his—up and down his legs, and I found a large object in his crotch area.

Q And, when you felt the large object in his crotch area, what happened?

A Okay. I asked him—I asked him what he had in there.

Q What was his response?

A He said, "I don't know."

Q What was your response to that?

A I asked him if he wanted to take it out himself, or if he wanted me to go in there and remove it.

Q And what did he say?

A He said, "No." He said, "I'll go ahead and take it out."

Q And then, what happened?

A Okay. He reached in, and came out with a brown paper bag, and placed it on the hood of the vehicle.

Q After he'd done that, what occurred?

A Okay. I opened the bag to see what was in it, and it contained a clear ziplock bag, with a quantity—again, a large quantity of a white powdery substance.

(Pause.)

Q What happened after you had unwrapped the package and saw the clear powdery substance?

A Okay. Once I identified the substance as—as—as a possible illegal drug, I went ahead and had both subjects—with the help of a fellow agent who had been overlooking the two passenger—the two occupants of the vehicle—I went ahead and had them both kneel down on their knees, and I handcuffed the passenger, and we escorted both subjects into the— to the holding cell of our I–15 checkpoint.

Q Do you recall at what point the other agent joined you?

A I believe he joined me at the time that I asked the passenger to exit the vehicle, at the start of the initial search.

Q And where did he position himself?

A He—

Q Do you recall?

A He stood behind the two subjects, just to keep an eye on them for officer safety, while I did the check of the vehicle. (Pause.)

Q Had you had the opportunity to smell methamphetamine before?

A Yes, sir.

Q And how often have you had that opportunity?

A Over the five and a half years that I've been in Temecula, I've probably had occasion to smell the drug on—in excess of 100 times.

Q And is that a distinctive smell to you?

A Yes, sir.

Q What does it smell like to you?

A To me, it smells kind of like a burnt vinegar smell.

Q And had you ever smelled that in a vehicle before, in secondary?

A Yes, sir.

Q How often has that occurred?

A In secondary, at the checkpoint, and in other stops, in—in the area there, approximately ten or twelve times.

Q And, when you smelled that distinctive smell, did you eventually locate any methamphetamine?

A Yes, sir.

Q How many times did that happen?

A Every time.

. . . .

**Cross–Examination:**

BY MR. JOHNSON:

Q Okay. When Ms. Whitaker and Mr. Soyland got to secondary, the first thing you did was ask them their citizenship?

A Yes, sir.

Q They both replied, "U.S. citizens"?

A Yes, sir.

Q You asked no other questions about their citizenship, because they appeared to you to be telling the truth?

A Yes, sir.

Q At that time, you, I believe, had Ms. Whitaker open the rear of the vehicle?

A Yes, sir.

Q And, this whole time, you were conducting what we would call Immigration search?

A Yes, sir.

Q You're looking to see if there might be someone in that car that's violating an Immigration law?

A Yes, sir.

Q And, in fact, you are employed, I believe, by the Border Patrol; is that correct?

A Yes, sir.

Q That is a branch of the Immigration and Naturalization Service?

A Yes, sir.

Q And wearing a uniform identifying yourself as such?

A Yes, sir.

Q You let them know by your questions, of course, that what you were conducting was an Immigration search?

A Yes, sir.

Q While searching the back of the car, you satisfied yourself that there was no one in the back that was hiding?

A Yes, sir.

Q And, so, you satisfied yourself that everyone in the vehicle was obeying all the Immigration laws, as far as you could tell?

A Yes, sir.

Q And, at that point, you did not tell them, "You've satisfied my Immigration questions. I would like to find out a little bit about narcotics violations"?

A No, sir.

Q Okay. Now, you had noticed—I believe your testimony was you had noticed earlier what you described as a

smell you associated with methamphetamine; is that right?

A Yes, sir.

Q And you also noticed a plastic grocery bag on the passenger floor?

A Yes, sir.

Q And you wanted to look inside the grocery bag because you thought there might be something illegal in it?

A Yes, sir.

Q And, so, at that time, you asked—in, I believe, your words—you asked permission to look into the interior of the vehicle?

A Yes, sir.

Q You didn't ask, "May I look inside that plastic bag"?

A No, sir.

Q And you didn't ask, "May I look inside any container that I might find in the car"?

A No, sir. I—I wasn't about to limit myself to any one area. I had no idea where something could be hidden in the vehicle.

Q When she said—when you said—or, rather, when you asked permission to look in the interior of the vehicle, she said, "Yes, go ahead", or some words to that effect?

A Yes, sir.

Q You found in there, I believe, a package of what we call Super B powder?

A Yes, sir.

Q That's a Vitamin B Complex; is that correct?

A Yes, sir.

Q That's something that, in your experience, may have some connection with cutting methamphetamine?

A Yes, sir—and other types of drugs also.

Q It also has, of course, legitimate purposes?

A Yes, sir.

Q Vitamin? Making vitamins, of course?

A Yes, sir.

Q So, this whole time, of course, while you're in secondary, perhaps—let's set the scene a little bit about what it looks like in secondary. At the end of the secondary, in the direction the cars are headed, are parked some marked units with lights on the top?

A They're not at the end; they're at the beginning. They're—as you pull into the secondary area, they would be behind you.

Q And some of those are what you call chase units?

A Yes, sir.

Q That's if someone is sent to secondary, and doesn't stay there, they'll chase them down and bring them back?

A Yes, sir.

Q And you, of course, were in your uniform?

A Yes, sir.

Q Wearing you sidearm?

A Yes, sir.

Q At the time that Mr. Soyland, who was the passenger, got out of the car, and Ms. Whitaker got out of the car, I believe your testimony was that you had another agent come and stand behind them for officer safety; is that right?

A I didn't have to call him. He was already in the area, and that's a practice of ours; yes, sir.

Q Okay. So, he saw what was happening, came over, and stood behind them for officer safety, of course?

A Yes, sir.

Q But, also, in case they took off running, he would have stopped them and brought them back?

A I—I would hope he would do that; yes, sir.

Q Well, that's his job, is to stop people— or part of his job is to stop people who try to run away from secondary?

A Well, I don't see why they would run away if their vehicle is there.

Q If they had run off on foot, you certainly would have stopped them or run after them, or asked someone to help you stop them?

A Yes, sir, I believe so; yes.

Q Now, this is particularly true if you suspect someone might be involved in some sort of drug offense. You really want to make sure that they don't get away; is that right?

A I don't see whether that would be any different whether it was drugs or aliens. A violation is a violation.

Q If you suspect someone's involved in a violation of the law, you're going to be particularly sure to make sure those people don't get away?

A Yes, sir.

Q And, in this case, there came a time when Ms. Whitaker became a suspect, in your mind, in a drug offense?

A Yes, sir.

Q And that when you smelled what you thought was a smell associated with methamphetamine?

A Uh—

Q And when you found a powder that you believed to be involved in methamphetamine manufacturing?

A Once I found the powder, definitely, yes, sir.

Q At that point, definitely, she was, in your mind, a suspect and definitely was not free to leave?

A Well, at that point, I had reason to believe that there may be illegal drugs in the vehicle.

Q Okay. And she was a suspect, and was not free to leave?

A I wouldn't say that she was not free to leave. She was not under arrest at that point. I had no solid violation.

Q Okay. Now—

A I'm sure that, if she had told me, "I'm leaving", then we probably would have had to do something to try to determine if there was not a violation.

Q At that point, I believe your earlier testimony was that, if she had taken off, someone would have stopped her?

A If she had said, "Excuse me; I'm tired of this and I'm leaving", then she would have been free to go, but the vehicle would not have left.

Q Okay. You, of course, didn't tell her that?

A No, sir, I did not.

Q Well, at that time, you thought she was a suspect in a drug violation, and you asked her some questions to find out if there were illegal drugs in the car?

A Just one question.

Q Okay. And that question was, "Are there any illegal drugs in the car"?

A Right.

Q She had not been Mirandized at that point?

A No, sir.

Q And by "Mirandized", you, of course, mean given or told about those rights, that you learned in the academy you went to to become a Border Patrol agent, that you give people before you question them; is that right?

A I did not Mirandize her, no, sir.

Q Then, you found some marijuana in the car?

A Yes, sir.

Q You searched the car a little bit more thoroughly, and you found a jacket?

A Yes, sir.

Q And you looked through the jacket and found some money?

A Yes, sir.

Q And, in your mind, a substantial amount of cash—hundreds of dollars—can be associated with a drug offense?

A Yes, sir.

Q So, you wanted to find out if she was associated with that money. So, you asked her if that jacket was hers?

A Yes, sir.

Q And, at that point, she had still not been Mirandized?

A No, sir.

. . . .

BY MR. McFADDEN:

Q Mr. Boubel, I think you indicated earlier that, at some point in time, you directed Mr. Soyland and Ms. Whitaker to get down on their knees; is that correct?

A Yes, sir.

Q And that was after you had decided that the material which you had collected—that is, the material out of the brown paper bag, and the container—might have methamphetamine; is that correct?

A Yes, sir.

Q And it wasn't until that time that you had decided to arrest Mr. Soyland and Ms. Whitaker; is that correct?

A No, sir. In my opinion, the subjects were under arrest and were being detained at the moment that I found the marijuana cigarettes.