**Mehmet Semih SIDALI, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, et al., Respondents.**

**Civil A. No. 95–5665 (MTB).**

United States District Court, D. New Jersey.

Jan. 31, 1996.

Thomas E. Moseley, Stryker, Tams & Dill, Newark, New Jersey, for Plaintiff.

Andrew O. Schiff, Assistant United States Attorney, Trenton, New Jersey, for Defendants.

## OPINION

BARRY, District Judge.

### INTRODUCTION

After a delay of Rip Van Winkle-like proportions, the United States sought petitioner's extradition to the Republic of Turkey even though he had been twice acquitted at trial before Turkish courts of the crime as to which extradition was sought and even though he may now face the death sentence. The only reason apparent from the record to explain why petitioner was plucked up almost twenty years after he legally entered the United States and more than twelve years after Turkey first requested his extradition was because Turkey had recently extradited, at the United States' request, a convicted drug dealer who had escaped from the Cook County (Chicago) jail and fled to Turkey. It appears, as well, that this is the first time that the United States has sought extradition of one found not guilty at two separate trials, and the first time since the Treaty between the United States and Turkey was entered into in 1979 that the United States has attempted to extradite anyone at all to Turkey.

The Magistrate Judge who handled the extradition request believed, correctly, that his review was constrained to answering certain discrete questions. The answers to those questions warranted, in his view, granting the certificate of extradition. He believed, as well, and again correctly, that it was only the Secretary of State who could review all of the circumstances of the case and, for humanitarian reasons, deny extradition. He urged, in two opinions, that the most careful review be undertaken by the Secretary. Indeed, one cannot read the record of the proceedings before the Magistrate Judge and come away with any conclusion other than that he expected that the Secretary's review would result in the denial of extradition. The Magistrate Judge asked the United States, for example, "Doesn't it strike you as unfair that someone has been acquitted twice at trials, has lived openly and apparently with an unblemished record in this country for ... almost twenty years[?]". Tr., Sept. 20, 1995 at 164. The United States responded "No", and the Secretary has again responded "No" by ordering that petitioner

be extradited. Thus, the petition for habeas corpus, now before this court, is most likely petitioner's last hope of remaining in this country, which he legally entered on January 2, 1977 with a Turkish passport after Turkish authorities had concluded that he had been acquitted and where he has openly lived a law abiding life since that time.

■ Some preliminary observations must be made. This court, on habeas review, is reviewing, under the appropriate standard of review, what the Magistrate Judge has determined and not issues such as whether petitioner, if extradited, will be granted due process and treated humanely in Turkey or whether all of the circumstances of the case warrant relief on humanitarian grounds. Those issues are for the Executive Branch, which possibly considered them and certainly determined them against petitioner. A habeas court is and must be concerned only with whether the alleged offense fell within the terms of an extradition treaty and whether an official with jurisdiction was presented with sufficient evidence to warrant a finding that there was a reasonable ground to believe that petitioner was guilty. *Ahmad v. Wigen,* 910 F.2d 1063 (2d Cir.1990). The *Ahmad* court was confident that this well understood and fairly narrow scope of review was all that was necessary because "[s]o far as we know, the Secretary never has directed extradition in the face of proof that the extraditee would be subjected to procedures or punishment antipathetic to a federal court's sense of decency [citation omitted]. Indeed, it is difficult to conceive of a situation in which a Secretary of State would do so." *Id.* at 1067.

This court will not determine because it need not determine—even if it were empowered to determine—whether this case presents such a situation and, if so, whether this court would be required to trample on the oath it took which, most assuredly, it would not do. Neither will this court determine because it need not determine whether, aside from the possible or probable or certain "procedures or punishment" petitioner will face, this saga—which began more than twenty-five years ago—warrants relief as a matter of fundamental fairness. These is-

sues need not be reached because the Magistrate Judge erred in finding that the United States proved that petitioner is under a judgment of conviction in Turkey and, in the alternative, that there was probable cause that petitioner committed the crime as to which extradition was sought. And so, while the parties have various motions and cross-motions now before this court, motions which will be briefly addressed and disposed of *infra*, the critical issue is whether the petition for a writ of habeas corpus should be granted. The answer to that question is a ringing "Yes."

### STATEMENT OF THE CASE

#### A. The Crime and Investigation in Turkey [1]

In 1970, petitioner Mehmet Semih Sidali lived with his family in a two-story house in Mersin, Turkey. Petitioner's father and mother lived on the upper floor, while petitioner and his family lived on the first floor. *Id.* Dursun Eskin, a fifteen year old girl whose mother was the adopted child of the family, also lived on the first floor. On the morning of April 18, 1970, Dursun was found dead in her bedroom. The autopsy report indicated that she had been raped and, thereafter, killed by strangulation.[2]

The day before the rape and murder, petitioner's father, daughter, and wife had gone to Ankara so that the father could receive medical treatment. While they were away, petitioner's aunt came to keep his mother company. Thus, Dursun aside, the people in the house on the night the murder was committed were petitioner, his mother, and his aunt, and they all slept upstairs.

On the night of the murder, petitioner came home at about 9:20 p.m., changed into his pajamas, and went upstairs to bed. The next morning, petitioner came downstairs at 7:30 a.m. and noticed that the key to a safe that had been in his jacket pocket was miss-

ing. He called his place of business, but nothing had been disturbed. In the meantime, petitioner's mother came downstairs, opened Dursun's bedroom door, and found that she was dead. Dursun had last been seen alive early on the evening of the murder when the family's dog barked loudly and continuously, and before petitioner returned home.

When the police arrived, petitioner suggested that a thief had broken into the house. He told them that the key to his safe had been taken but that no money was missing. He also pointed them to the balcony door of the living room, from which he believed an intruder had entered the house. An examination of the door revealed that there were two points at which force had been applied with an old screwdriver between the door and the frame. *Inspection Report,* April 19, 1970 (attached at *Pet.'s Br.,* Exh. F.) Moreover, there was a red iron sliding bar attached to the glass, but the frame into which it should have fit was not in place and could not be found. The four screws which held the sliding bar were loosened as a result of having been forced. *Id.* The investigation determined, however, that there was nothing missing from the house, that nothing in the house had been disturbed, and that there were no fingerprints on the door, the locks of the windows, or the buckle of the belt which was used to strangle Dursun. Interestingly, the same officer who made the report on the day of the murder found, two days later and with no explanation for the switch in stories, "not any attempt that proved intrusion ... using any tools like screwdrivers...." High Criminal Court of Mersin, Republic of Turkey, July 6, 1972 ("First Trial Ruling") at 18, attached at Pet.Br., Exh. D; Resp.App., Ex. 2.

A physical examination of petitioner showed no bruises or scratches on his hands, neck, face, or body, or the area surrounding his penis. Blood found on Dursun's bed

---

1. The background facts surrounding both the crime and the investigation are largely undisputed with the battle being fought solely over whether those facts support a finding of probable cause and then only if petitioner is not already under a judgment of conviction. This court will only cite to the record when an alleged fact is in dispute.

All citations are to the English translations, where there have been translations.

2. Dursun was strangled with a belt that came from a dress belonging to petitioner's wife. The dress was found hanging in the wife's closet.

sheet and underwear was determined to be Type O, Dursun's blood type and not petitioner's, and investigators did not attempt to identify the blood type of a sperm stain found on the sheet. Neither were blood spots on a cloth found in a waste basket and a blood spot on petitioner's pajama top tested because they were deemed to be too small to yield accurate blood group typing.[3] Finally, no pathologist's report established the time of death.

### B. *Legal Proceedings in Turkey*

On April 20, 1970, petitioner was arrested in connection with Dursun's death, detained for two months, and released in June 1970. In May 1971, he was charged with rape and murder and was again arrested and taken into custody. He was tried for nine months before the First High Criminal Court of Mersin, a three-judge panel. In a decision dated July 6, 1972, the court found that the evidence was neither sufficient nor concrete enough to convict petitioner, there were no witnesses to the crime, and blood and semen samples could not be accurately tested. First Trial Ruling at 25–26. Thus, by a vote of two to one, petitioner was found not guilty of murdering Dursun and was released.

Pursuant to Section 289 of the Turkish Code of Criminal Procedure ("TCCP"), the trial court's decision was appealed. The appeal was heard and decided by the First Criminal Panel of the Supreme Court of Appeals on February 5, 1973. *Supreme Court of Appeals*, Feb. 5, 1973 ("Court of Appeals Decree") (attached at *Pet.'s Br.*, Exh. H; *Resp.App.*, Ex. 2). The court found that the judgment of acquittal was based on written evidence which was "not in line with the existing quality of evidence". *Id.* at 3. In addition, the court found that the majority below did not disprove the evidence raised by the dissenting opinion. *Id.* Because this was "contrary to the law", the court reversed

the judgment, pursuant to Article 321 of the TCCP.[4] *Id.*

After the reversal by the Court of Appeals, the First High Criminal Court of Mersin was obligated to conduct a retrial, which it did. A panel of three judges, with only the Chairman the same as at the first trial, reviewed the evidence and, on July 16, 1976, voted unanimously to acquit petitioner. *First High Criminal Court of Mersin, Republic of Turkey*, Judgment, July 16, 1976, ("Second Trial Ruling"), at 36 (attached at *Pet.'s Br.*, Exh. I; *Resp.App.*, Exh. 2). The court was persuaded by the fact that petitioner's body showed no sign of a struggle and that it would not have been impossible for an intruder to have gotten into petitioner's home to commit the offense. *Id.* at 31, 33. The court did not believe that petitioner had a motive to kill Dursun and conjectured that if he had committed the offense, he would have had time to get rid of any incriminating evidence. *Id.* at 23–25. For these reasons, the trial court persisted in its original verdict.

Decisions to persist are reviewed by the Court of Appeals' General Board of Criminal Panels (the "General Board"). The General Board is composed of the Heads of Departments and members of the Criminal Panels of the Court of Appeals. By a vote of 24 to 8 on December 13, 1976, the General Board found that the reasons cited by the trial court were insufficient to insist on the previous judgment. *General Board of the Criminal Panels of the Supreme Court of Appeals*, Judgment of the Supreme Court of Appeals, Dec. 13, 1976 ("General Board Judgment"), at 6 (attached at *Pet.'s Br.*, Exh. J; *Resp. App.*, Exh. 2). Finding sufficient evidence that "the accused transgressed the fifteen year old victim's virginity ... and murdered the victim with his wife's belt", the General Board "annull[ed] the judgment for the acquittal of the accused". *Id.* at 6–7.

---

**3.** Petitioner explained at his extradition hearing that the spot of blood on his pajama sleeve was from a mosquito bite the night before the murder and that the cloth containing the blood stain had been used to clean a small cut on his son's forehead two or three days before the murder. Tr., Sept. 20, 1995, at 44–45, 69–70.

**4.** "The Court of Appeal reverses the judgment to which objection is raised on the points where the law is violated. If the violation of the law that caused the reversal of the judgment was based on the facts determined as the basis of the judgment, related proceedings are also reversed at the same time."
TCCP, Art. 321 (Fred B. Rothman Co.1962).

Without knowledge of the General Board's December 13, 1976 decision and, thus, believing he had been acquitted, petitioner applied for a passport on or about December 17, 1976. He was detained by Turkish authorities from December 17 to December 20, 1976 and told he could not leave Turkey. On December 20, 1976, also believing petitioner had been acquitted, the Turkish government gave petitioner clearance, and he received his passport.[5] He applied for a visa to come to the United States and left Turkey on or about December 31, 1976.

## C. *Proceedings in the United States*

Petitioner became a lawful permanent resident of the United States on September 17, 1990, and he has lived openly in the United States since his arrival on January 2, 1977. Records indicate that Turkey's first request for petitioner's extradition was made in or about February 1982. *Pet.'s Br.*, Exh. K. It appears, however, that because of what United States' officials conceded to be "various mistakes" as well as "confus[ion] . . . about the legal proceedings in Turkey," the United States took no action to extradite petitioner and the issue only surfaced in 1993, and then only after—and because—Turkey extradited Erdogan Kurap (a narcotics trafficker who, in 1992, escaped from the Cook County jail) to the United States. *Pet.'s Br.* at 8, Exh. L; Tr. Sept. 20, 1995 at 151.

On or about October 31, 1994, more than twelve years after the request for extradition had first been made, the United States commenced this extradition proceeding against petitioner by filing a complaint pursuant to 18 U.S.C. § 3184,[6] which complaint was assigned to United States Magistrate Judge John J. Hughes. The complaint alleged that petitioner had been convicted of a crime specified in the extradition treaty between Turkey and the United States (the "Treaty").[7] The Magistrate Judge issued a warrant for petitioner's arrest, and petitioner

was arrested and detained on November 16, 1994.

The Magistrate Judge held an extradition hearing on September 20, 1995. At the hearing, petitioner raised six arguments as to why extradition was improper: (1) the Turkish request did not meet the requirement of dual criminality; (2) he was not convicted, and there is insufficient evidence to establish probable cause; (3) his extradition is barred by lapse of time; (4) his extradition is barred because he is in the process of applying for citizenship; (5) extradition should be denied for reasons of reciprocity and fundamental decency; and (6) 18 U.S.C. § 3184 is unconstitutional. *Id.* at 1346–50. After considering all of petitioner's arguments, by Memorandum Opinion and Order dated September 22, 1995, the Magistrate Judge certified petitioner's extradition. *In the Matter of the Extradition of Sidali*, 899 F.Supp. 1342 (D.N.J.1995). He found, as well, that petitioner did not present a risk of flight and ordered him released on bail. *Id.* at 1351–52. Reconsideration was denied in a Memorandum Opinion and Order dated on October 27, 1995. *Am.Compl.*, Exh. C.

On November 6, 1995, petitioner filed the complaint in this action challenging the INS's failure to act on his application for naturalization. *Compl.*, ¶¶ 8–11. On December 6, 1995, the Secretary of State issued a warrant for petitioner's surrender to Turkey. On December 12, 1995, petitioner amended his complaint by adding two counts seeking habeas corpus review of the Magistrate Judge's decision. *Am.Compl.*, ¶¶ 15–18. On December 15, 1995, he filed a motion for a stay of his extradition pending review, which this court subsequently granted, and respondents cross-moved for dismissal of petitioner's claims against the INS, for summary judgment on his habeas corpus petition, and for revocation of bail, the last of which this court subsequently denied. Petitioner has also

---

5. The city of Ankara, Turkey's police chief wrote a letter authorizing the recission of the restraining order "as the subject person was acquitted of that crime." *Pet.'s App.*, Ex. C.

6. Section 3184 permits a magistrate judge to conduct extradition proceedings if authorized to do so by "a court of the United States". 18

U.S.C. § 3184 (1995). Local Rule 40B(12) provides this authorization.

7. *See* Treaty on Extradition and Mutual Assistance in Criminal Matters, June 7, 1979, U.S.–Turkey, T.I.A.S. No. 9891 (attached at *Resp.App.*, Exh. 1).

cross-moved for discharge under 18 U.S.C. § 3188.

### DISCUSSION

 Extradition orders do not constitute final decisions of a district court which are appealable as of right under 28 U.S.C. § 1291. A person who is to be extradited, however, may obtain review of an order of extradition by seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2241. *Collins v. Miller*, 252 U.S. 364, 369, 40 S.Ct. 347, 349, 64 L.Ed. 616 (1920); *Bozilov v. Seifert*, 983 F.2d 140, 142 (9th Cir.1993); *Spatola v. United States*, 925 F.2d 615, 617 (2d Cir. 1991). The scope of habeas corpus review of a magistrate judge's order of extradition is quite narrow, however—narrower, in fact, than in the habeas proceedings traditionally provided for American convictions. *Escobedo v. United States*, 623 F.2d 1098, 1101 (5th Cir.1980); *Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2d Cir.1973); *Spatola v. United States*, 741 F.Supp. 362, 369. The district court's review is limited to whether: (1) the magistrate judge had jurisdiction; (2) the offense charged is within the treaty; and (3) probable cause exists to find the accused guilty. *Yapp v. Reno*, 26 F.3d 1562, 1565 (11th Cir.1994); *Bozilov*, 983 F.2d at 142; *Spatola*, 925 F.2d at 617.

 There is no serious dispute as to whether the Magistrate Judge had jurisdiction or whether the offense charged is within the Treaty; rather, the dispute is over the element of probable cause. The United States argues, correctly, that a foreign judgment of conviction, obtained following a trial at which the accused was present, is sufficient proof that probable cause exists. *Spatola*, 925 F.2d at 618. *See* Restatement (Third) of the Foreign Relations Law of the United States § 476 cont. b (1987) ("With respect to persons whose extradition is sought after conviction in the requesting state, the requirement [of probable cause] is met by proof of the judgment of conviction and, where applicable, of sentence".). Petitioner does not disagree arguing, instead, that he has not been convicted and that probable cause does not otherwise exist.

Hundreds and hundreds of pages of exhibits were submitted to the Magistrate Judge—and to this court—in the parties' efforts to show that petitioner was—or was not—conclusively found guilty by the decision of the General Board in December 1976. The parties agree that the legal effect of the General Board's decision is the critical issue, at least as an initial matter. Thus, and aside from the host of other issues petitioner has raised, if that decision conclusively determined guilt even though sentence has not yet been imposed, extradition would appropriately have been ordered because petitioner would be deemed "convicted." The parties also agree that, if the General Board's decision did not conclusively determine guilt and, thus, that there was not a conviction, this court must press on and reach the question of whether the United States has shown probable cause that petitioner committed the crime with which he is charged. If the United States makes this showing, extradition, again, would appropriately have been ordered, petitioner's other issues aside. If, however, probable cause is lacking, the writ of habeas corpus will be granted, extradition denied, and the bulk of the remaining issues relegated to the cutting room floor.

### A. *Was Petitioner Convicted?*

 The extensive submissions of the parties were distilled by the Magistrate Judge into one paragraph of his opinion, to wit:

Here, the Court has reviewed the actual judgment of the General Criminal Board of the Court of Appeals, analyzed the relevant Turkish law (principally Sections 325 and 326 of the Turkish Code of Criminal Procedure), and considered the written communications between the two countries in connection with this extradition request (principally the Certification and Diplomatic Note, dated 2/17/95) (Exhibit G–5). The Court has also considered the legal expert opinions offered by the Respondent and the Government. (Exhibits S–1 and G–6). The Court adopts, as more persuasive given all the circumstances, the opinion that the action of the Turkish Court of Appeals resolves the issue of guilt or innocence and that there will be no third trial.

899 F.Supp. at 1347. This court's review of the Magistrate Judge's legal determination is plenary.

If one thing is clear, it is this: it is anything *but* clear whether petitioner has been convicted. Stated somewhat differently, the United States has failed in its burden of proof, and the Magistrate Judge erred in finding that it had not.

"Principally," in his word, the Magistrate Judge relied upon the diplomatic note, received by the Department of State on February 17, 1995, which, to be sure, said everything that had to be said for a finding of conviction, i.e. pursuant to Article 326 of the Turkish Code of Criminal Procedure, the judgment is final and all that remains is sentencing. (*Resp.App.*, Exh. 5). This note, however, as petitioner argued below, should not have been admitted into evidence—it was unsigned, there is no way of knowing who prepared it, and there is no indication either of that person's title or credentials or of any qualifications that person may or may not have had to opine on the legal significance of Article 326 or of the General Board's decision. But even assuming that the Magistrate Judge correctly determined that these impediments went to weight, not admissibility, (Tr. Sept. 20, 1995 at 28–29), the weight of the note with these impediments was virtually nil.

The Magistrate Judge specified certain other evidence which prompted him to conclude that there had been a conviction. The critical document—the judgment of the General Board—itself, however, states only that it "annul[s] the previous judgment of the court" and does not by its terms impose a conviction or make a finding of guilt. And Turkish law, specifically Articles 325 and 326 on which the Magistrate Judge "principally" relied, add—and clarify—nothing. Article 325 applies only to judgments which have "been reversed in favor of the accused because of the violation of law regarding the application of the punishment." *TCCP*, Art. 325. Because the General Board annulled a judgment to the detriment of the accused, this provision is utterly inapplicable. Article 326 merely states that courts are "obliged ... to abide by decisions given by the General Criminal Board of the Court of Appeal." *TCCP*, Art. 326. It is impossible to "abide by" the General Board's decision, however, without knowing what was meant when the General Board "annull[ed]" the second acquittal, and that is anything but clear.

And so the court must turn to the written communications between the United States and Turkey in connection with this extradition request, communications which are all over the lot and so confused that the anonymous diplomatic note was submitted "to clarify statements contained in documents previously submitted by the Government of Turkey to the Government of the United States requesting [petitioner's] extradition...." *Id.*, Declaration of Thomas A. Johnson, attached to Feb. 17, 1995 note at *Resp.App.*, Exh. 5.

Some examples underscore the morass which preceded and prompted the "clarification." On November 1, 1985, for example, the Mersin Public Prosecutor wrote a memo to the Ministry of Justice describing the General Board's decision as finding the second acquittal improper in light of the evidence presented which was found sufficient to punish petitioner, albeit he was still referred to as "the accused." *Resp.App.*, Exh. 4. Moreover, the September 25, 1992 Supplementary Request for Extradition by the Mersin Prosecutor stated that the General Board's decision was final and absolute and that the trial court had begun retrying the matter to determine the punishment to be imposed on "the accused," who was found "conclusively guilty." *Resp.App.*, Exh. 2.

Cutting the other way are exhibits such as the letter from the General Director, Directorate of Criminal Affairs, Republic of Turkey, dated April 15, 1993 to the Attorney General of Mersin attaching correspondence with reference to petitioner "who is being tried ... by the First Criminal Court of Mersin for charges of raping and strangling" the victim. The attached correspondence described petitioner as having been "accused of voluntary manslaughter," and asked, "What is the statute of limitations for the crime that has allegedly been committed by [petitioner] and when will it run?," and "Will [he] be able

to present new evidence at trial [and] appeal the judgment?" *Pet.Br.*, Exh. L.

Also supportive of petitioner's position is the May 26, 1993 report of the Attorney General of Mersin, which stated that petitioner will be tried a "third time" and will be able to defend himself, call witnesses, offer new evidence and appeal an adverse result. The Certificate of the U.S. Ambassador to Turkey, which accompanied that report, described petitioner as "charged with" the crimes of rape and murder. *Pet.Br.*, Exh. M.

Clarification was surely needed; indeed, the Magistrate Judge, in his opinion of January 27, 1995 in which he reconsidered the denial of bail—and granted bail—stated that he was "not so sure that [it] is accurate" that the conviction is final and that there would be no other trial." "[T]he proposition remains far from clear," he continued, concluding that he was "inclined to believe that [petitioner] will be afforded a new trial if extradited to Turkey." Opinion, Jan. 27, 1995 at 9–10. "[S]purred [into] action" by the Magistrate Judge, the United States "requested clarification from the Turkish Government." Tr., April 17, 1995, at 7–8. The Turkish government thereafter submitted the diplomatic note of February 17, 1995 which supposedly "reaffirmed the position" that all that remained was sentencing. *Id.*

Even assuming that the February 17, 1995 supposed "clarification" was admissible and assuming further that, if admissible and if accorded a reasonable modicum of weight, it would carry the day as to the issue of conviction, communications between the United States and Turkey subsequent to February 17, 1995 muddied the waters all over again. To be sure, the October 11, 1995 Declaration of Thomas A. Johnson, the author of the "clarification" declaration, stated that the position of the United States and Turkey on the fact of the conviction had been consistent. Exh. 5 to *Resp.* Reply Br. Unfortunately for the United States, however, other communications call this statement into question, including one from Mr. Johnson himself. Thus, in a letter of August 10, 1995, Mr. Johnson stated that Turkey sought extradition so that petitioner could "face charges", a statement he later repudiated as "inartful."

*Pet.Br.*, Exh. K; Decl. of Thomas A. Johnson, Oct. 11, 1995, attached to Resp.Reply Br. "Charged with" language was used by the American Ambassador to Turkey on September 13, 1995 (Resp.Exh. 6); an October 20, 1995 memorandum from the Justice Ministry, Republic of Turkey, stated that petitioner was "to stand trial ... on the charge...."; and an October 24, 1995 memorandum of the panel present to try petitioner spoke of the "trial" and the fact that "trial" was postponed until January 25, 1996 when it was expected that petitioner would have been returned. Moseley Cert., Exh. B. And, of course, in addition to communications between the United States and Turkey which post-dated the diplomatic note, there was the predictably competing—and predictable—testimony of the parties' experts and the April 4, 1995 statement of petitioner's trial attorney that "[T]rial is underway ... If the court finds the defendant guilty, he has a right to appeal...." Pet.App., Exh. D.

If more were needed to come to the conclusion that the United States has not proved that petitioner was "conclusively guilty" and, in this court's view, it most assuredly is not, at oral argument the United States had to worm its way out of the statement in its reply brief that "[I]t may well be easier for [petitioner] to get a new trial in light of advances in forensics...." Resp.Reply Br. at 6. And the final word on the matter, also at oral argument, was the concession by the Assistant U.S. Attorney that "We'll never know until he gets back to Turkey what the right answer [is] ... It could come out either way...." Tr., 1/22/96, at 43, 45. Game, set, and match.

This court has conducted a *de novo* review of the evidence before the Magistrate Judge when he ruled on September 22, 1995 and concludes that the United States did not prove that the decision of the General Board constituted a final judgment or conviction and, to the extent the Magistrate Judge ruled otherwise, he erred. Moreover, the evidence which followed that ruling and which was presented either to the Magistrate Judge on reconsideration or to this court in the first instance, only underscores this failure of proof.

One final note. The Magistrate Judge denied petitioner discovery of documents relating to the first extradition request by Turkey and communications and correspondence between the United States and Turkey as to whether the General Board's decision constituted a conviction; indeed, the United States had not even provided petitioner with the formal extradition request made by Turkey in 1982 which it returned to Turkey without retaining a copy in its files.[8] While the Magistrate Judge was "not satisfied with the government's explanation" as to why all relevant documents had not been provided, he did not want to delay petitioner's "day in court". Tr., Sept. 20, 1995 at 16–19. Given this court's disposition, the court need not determine whether the Magistrate Judge rightly or wrongly denied this discovery. In any event, this court has the abiding sense that more documents and correspondence would only have added to the confusion.

And so the court must press on....

### B. *Is There Probable Cause?*

■ Having concluded that the United States did not prove a final judgment or conviction and, thus, that probable cause cannot be satisfied by the fact of conviction alone, this court must inquire as to whether there is competent evidence to establish probable cause. The Magistrate Judge found that the United States presented sufficient evidence that independently established probable cause. Again, in this court's view, he erred.

■■ To issue an order certifying extraditability, the magistrate judge must find that there is probable cause to believe that the accused committed the crime charged.[9] To this end, the magistrate judge's function is not to decide the accused's guilt or innocence but only to determine whether there is competent evidence to justify holding the accused to await trial. *Collins v. Loisel,* 259

U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922); *Bozilov,* 983 F.2d at 143; *Shapiro,* 478 F.2d at 900–01. The magistrate judge does not weigh conflicting evidence or make factual determinations; rather, he or she looks only to see if there is evidence sufficient to show reasonable grounds to believe the accused guilty. *Quinn v. Robinson,* 783 F.2d 776, 815 (9th Cir.1986); *Sayne v. Shipley,* 418 F.2d 679, 685 (5th Cir.1969).

■ In reviewing the magistrate judge's determination of probable cause, the district court must assess whether there is any competent evidence to support his or her finding. *Quinn,* 783 F.2d at 815; *Eain v. Wilkes,* 641 F.2d 504, 508 (7th Cir.1981). The weight and sufficiency of that evidence is for the determination of the committing court. *Quinn,* 783 F.2d at 815; *Escobedo,* 623 F.2d at 1102.

While invoking the caveat "among other facts", the Magistrate Judge found only the following facts important enough to specify in reaching his conclusion: "[T]he victim lived in Mr. Sidali's home; ... she was raped and strangled; ... Mr. Sidali had the opportunity to commit the crime; ... Mr. Sidali was the only man living in the home at the time; ... there was no conclusive proof that anyone else had entered the house; and ... blood was discovered on Mr. Sidali's pajama sleeve shortly after the crime". *Sidali,* 899 F.Supp. at 1347. Not surprisingly, this recitation calls to mind the Magistrate Judge's questions to the United States at the oral argument before him after reciting those very facts: "How many cases do you think [with] this kind and scope of evidence would survive a motion for judgment of acquittal at the end of the prosecution, if this were all the evidence?" "Do you think ... any case would survive?" Tr. Sept. 20, 1995 at 141–42.

---

8. The United States explained that extradition requests are returned "if the documents were found to be insufficient in some respect, and that usually means no identification evidence or it wasn't properly certified...." Tr. Sept. 20, 1995 at 18.

9. The Treaty requires,

A request relating to a person being prosecuted or who is charged with an offense, and who has yet to be convicted, shall be accompanied by the following: ... Such evidence as, according to the laws of the Requested Party, would justify arrest and committal for trial of the person sought if the offense had been committed in the territory of the Requested Party. *Treaty,* Ch. I, Sec. II, Art. 7(1)(c).

Most assuredly, it would not, and neither does this "evidence" establish probable cause. Three of the reasons specified by the Magistrate Judge for finding probable cause rest solely on the fact that the crime occurred in petitioner's home and that he was the only man living there that night. Even had there been evidence that petitioner was in his home when the crime occurred, mere presence at the scene of a crime does not constitute probable cause. *Ybarra v. Illinois,* 444 U.S. 85, 90, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979); *United States v. Soyland,* 3 F.3d 1312, 1313 (9th Cir.1993); *United States v. Soto,* 908 F.2d 209, 211 (7th Cir.1990); *United States v. Butts,* 704 F.2d 701, 703 (3d Cir.1981). This is especially true when the scene of the crime is petitioner's home where his presence, if, indeed, he was present, is eminently reasonable.

But there is no evidence that petitioner was even present when the rape and murder occurred and *a fortiori* no evidence that he had the opportunity to commit the crime. Thus, there is no pathologist's report as to the time of death and no evidence aside from a "guesstimate" by the investigators that the victim—who was not seen by anyone after the barking dog prompted concern early in the evening—did not die before petitioner indisputably arrived home at 9:20 p.m.; indeed, the "autopsy," such as it was, was performed at the cemetery with the "preacher" assisting. And, wholly apart from the barking dog, there is evidence that there may well have been an intruder. While the Magistrate Judge correctly determined that that evidence was not conclusive, the surprising change of position of the same police officer a mere two days later is unexplained.

■ In any event, to establish probable cause, there must be something more than mere presence and something more than mere opportunity. *See Soyland,* 3 F.3d at 1313 (requiring a "sufficient link" between the accused and the crime). The only "link" which the Magistrate Judge mentions is the "blood discovered on petitioner's pajama sleeve shortly after the crime." *Id.* at 1348. There is nothing linking this lentil-sized stain to the crime, however—it was supposedly too small to be tested for blood typing, and there was no attempt to try. Similarly, and for whatever reason, the semen found at the scene was not tested, and no finger prints and no hair samples were found. There is utterly nothing linking petitioner to the crime.

■ Parenthetically, at the extradition hearing, petitioner explained how the small blood stain on his pajama sleeve came to be.[10] It is permissible in an extradition proceeding for the defendant to explain ambiguities or doubtful elements bearing upon probable cause. *Collins,* 259 U.S. at 315, 42 S.Ct. at 471. The Magistrate Judge misunderstood this explanation as an attempt to have him weigh the testimony and make credibility determinations as to guilt or innocence, determinations within the province of the trial court or jury, not the extradition court. *Sidali,* 899 F.Supp. at 1348. But there was no testimony whatsoever presented by the United States at the extradition hearing and no evidence that the blood on the pajama sleeve was anyone's but petitioner's. There was, therefore, nothing to weigh and nothing to contradict.

Explanations aside, there was no competent evidence warranting a finding of probable cause. The writ of habeas corpus will be granted.[11]

10. The Magistrate Judge denied petitioner's request to have DNA testing done of the spot of blood and, in his Memorandum Opinion on reconsideration of the order of extradition and his discovery rulings, observed that the United States' "interest in maintaining effective diplomatic relations with Turkey far outweighs any legitimate need of [petitioner] in obtaining forensic evidence for use in an extradition hearing...." Opinion, Oct. 27, 1995 at 5. While the "effective diplomatic relations" here is no more complicated than "You gave us our guy, we'll give you yours" and while the forensic evidence

could well be dispositive, the United States, at oral argument before this court, was uncertain whether the pajama top still exists. Given this court's disposition on the issue of probable cause, it need not reach the thorny questions presented by the Magistrate Judge's ruling and the potentially missing evidence.

11. Given this disposition, the motions pending before the court can be disposed of summarily. Respondents' motion for summary judgment on Counts Three and Four of the Amended Complaint—the habeas corpus claims—is, of course,

*ORDER*

For the reasons expressed in this court's opinion of even date,

IT IS on this 31st day of January, 1996

ORDERED that defendants'/respondents' motion (1) for summary judgment on Counts Three and Four of the Amended Complaint be and hereby is denied; for committal of plaintiff/petitioner to the custody of the Attorney General pending his surrender to Turkish officials be and hereby is denied; and (3) for dismissal of Counts One and Two of the Amended Complaint be and hereby is granted; and it is further

ORDERED that plaintiff's/petitioner's cross-motion for discharge under 18 U.S.C. § 3188 and motion to file a Second Amended Complaint be and hereby are denied as moot; and it is further

ORDERED that the petition for habeas corpus (Counts Three and Four of the Amended Complaint) be and hereby is granted, and this action is dismissed.

denied, as is their motion to commit petitioner to the custody of the Attorney General pending his surrender to Turkish officials. Respondents' motion to dismiss Counts One and Two—which seek to compel INS action on petitioner's application for naturalization—is granted, there being no showing at this time that such action has been unlawfully withheld. Petitioner's cross-motion for discharge under 18 U.S.C. § 3188 is denied as moot, as is his motion to file a Second Amended Complaint.