**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. VICTOR OROZCO, *Defendant-Appellant.* | No. 15-10385 D.C. No. 3:13-cr-00048-MMD-WGC-1 OPINION |

Appeal from the United States District Court
for the District of Nevada
Miranda M. Du, District Judge, Presiding

Argued and Submitted October 20, 2016
San Francisco, California

Filed June 1, 2017

Before: A. Wallace Tashima and Milan D. Smith, Jr.,
Circuit Judges, and Edward R. Korman,[*] Senior District
Judge.

Opinion by Judge Korman

---

[*] The Honorable Edward R. Korman, Senior District Judge for the
U.S. District Court for the Eastern District of New York, sitting by
designation.

## SUMMARY[**]

### Criminal Law

The panel reversed the district court's denial of a motion to suppress, vacated a conviction for two counts of drug possession arising from a stop of a tractor-trailer driven by the defendant, and remanded for further proceedings.

Nevada Highway Patrol troopers made the stop in order to investigate criminal activity, even though they lacked the quantum of evidence necessary to justify the stop. The panel held that the stop was not justified under the administrative search doctrine, which permits stops and searches, initiated in furtherance of a valid administrative scheme, to be conducted in the absence of reasonable suspicion or probable cause.

The panel held that an administrative scheme allowing Nevada law enforcement officers to make stops of commercial vehicles and conduct limited inspections without reasonable suspicion was valid on its face because its purpose was to ensure the safe operation of commercial vehicles. The objective evidence in this case, however, established beyond doubt that the stop of the defendant's vehicle was a pretext for a stop to investigate information of suspected criminal activity short of that necessary to give rise to reasonable suspicion. The stop would not have been made in the absence of a tip that the defendant was possibly carrying narcotics. Accordingly, the stop was a pretextual stop that violated the Fourth Amendment. The panel emphasized that the presence

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

of a criminal investigatory motive, by itself, does not render an administrative stop pretextual, and nor does a dual motive—one valid and one impermissible. Rather, the defendant must show that the stop would not have occurred in the absence of an impermissible reason.

## COUNSEL

Justin J. Bustos (argued), Dickinson Wright PLLC, Reno, Nevada, for Defendant-Appellant.

William R. Reed (argued), Assistant United States Attorney; Elizabeth O. White, Appellate Chief; United States Attorney's Office, Reno, Nevada; for Plaintiff-Appellee.

## OPINION

KORMAN, District Judge:

This appeal arises out of the stop of a tractor-trailer, driven by defendant-appellant Victor Orozco, on a highway in Nevada. The Nevada Highway Patrol troopers made the stop in order to investigate criminal activity, even though they lacked the quantum of evidence necessary to justify the stop. Ultimately, the stop led to a consent search, during which officers found heroin and methamphetamine, which served as the basis for Orozco's indictment and conviction on two counts of possession. The question in this appeal is whether the stop was justified under the administrative search doctrine, which permits stops and searches, initiated in furtherance of a valid administrative scheme, to be conducted in the absence of reasonable suspicion or probable cause.

Nevada law enforcement officers may make stops of commercial vehicles and conduct limited inspections without reasonable suspicion "[t]o enforce the provisions of laws and regulations relating to motor carriers, the safety of their vehicles and equipment, and their transportation of hazardous materials and other cargo." Nev. Rev. Stat. § 480.360. This administrative scheme is valid on its face because its purpose is to ensure the safe operation of commercial vehicles—*not* to provide cover for criminal investigatory purposes, such as drug interdiction, for which reasonable suspicion or probable cause is lacking.

In practice, however, this administrative scheme may also used as a pretext for conducting stops to investigate criminal activity. Indeed, one of the Nevada troopers involved in the stop at issue here testified that it was "common knowledge that if you suspect criminal activity, that you can use your administrative powers to make a stop." With respect to the stop of the vehicle at issue here, the Nevada trooper testified that he may have had a discussion with his colleague, and possibly his sergeant, as to how "you could utilize the administrative inspection to stop this truck that you believed was hauling marijuana–or methamphetamine." Specifically, he said, "I don't know if we had a discussion, but it's common knowledge that we can do that, yes."

Under these circumstances, it does not matter that the Nevada administrative scheme was valid on its face, where the objective evidence—detailed below—establishes beyond doubt that this stop was a pretext for a stop to investigate information of suspected criminal activity short of that necessary to give rise to reasonable suspicion. The stop would not have been made in the absence of the tip that Orozco was possibly carrying narcotics in his tractor-trailer.

This fits the classic definition of a pretextual stop that violates the Fourth Amendment.

The consent to search that was obtained after the driver of the truck, Victor Orozco, had been detained for approximately an hour was the fruit of the unlawful stop. So too was the evidence found pursuant to the consent search. We now proceed to a more thorough discussion of the relevant factual background and legal principles.

## BACKGROUND

### I.   Nevada's Administrative-Search Scheme

Because the argument in support of the validity of the stop of Orozco's tractor-trailer is intertwined with the administrative scheme that Nevada has adopted to regulate commercial motor vehicles, we begin with a discussion of that regulatory scheme. The Nevada Legislature has charged the Nevada Transportation Authority with regulation of motor carriers such as the tractor-trailer driven by Orozco. It is the duty of the Department of Public Safety, and its subsidiary arm, the Nevada Highway Patrol, to enforce the regulations adopted by the Authority. Nev. Rev. Stat. § 706.151(1). Nevada law provides for the Authority to "employ compliance enforcement officers whose duties shall include, without limitation, enforcement activities to ensure motor carriers are operating in compliance with state statutes and regulations, conducting operational inspections of motor carriers and investigating complaints against motor carriers." Nev. Rev. Stat. § 706.176(4). These officers may "examine, at any time during the business hours of the day, the books, papers and records of any fully regulated carrier, and of any other common, contract or private motor carrier doing

business in this State to the extent necessary for their respective duties." Nev. Rev. Stat. § 706.171(1)(d).

Nevada has also enacted a Commercial Vehicle Safety Plan ("CVSP"), which complies with the Motor Carrier Safety Assistance Program's requirements for receiving federal highway funding by, *inter alia*, requiring Nevada Highway Patrol troopers to conduct inspections in a manner consistent with "the North American Standard ["NAS"] Inspection procedure." 49 C.F.R. § 350.211(d). The Motor Carrier Safety Assistance Program "is a Federal grant program that provides financial assistance to States to reduce the number and severity of accidents and hazardous materials incidents involving commercial motor vehicles." 49 C.F.R. § 350.101(a). Nevada's CVSP provides that the Nevada Highway Patrol's "enforcement activities" will include "scheduled *and unannounced* roadside inspections." STATE OF NEVADA, COMMERCIAL VEHICLE SAFETY PLAN 7 (2011) (emphasis supplied), *available at* http://nhp.nv.gov/ uploadedFiles/nhpnvgov/content/CE/CVSP2011.pdf [https://perma.cc/P6VZ-R4F9]. A "NAS Level III" inspection—the inspection at issue here—includes not only a stop of a vehicle, but an entry into the cab for a full review of the driver's papers, although it excludes any inspection of the mechanical fitness of the vehicle. It is geared toward preventing and deterring dangerous driving by, for example, including a review of the driving log, which would reveal whether a driver had exceeded the maximum time allowed on the road, among other possible safety violations.

Nevertheless, "compliance enforcement officers" include Nevada Highway Patrol troopers who are trained to conduct NAS inspections but are also charged with enforcement of Nevada's criminal laws, including "[m]aking arrests for

crimes committed in their presence or upon or adjacent to the highways of this State." Nev. Rev. Stat. § 480.360(1)(b). This merger of administrative and law enforcement responsibilities in Nevada Highway Patrol troopers, combined with the unconstrained discretion they have in selecting which vehicles to stop and search, accounts for the candid admission by the troopers who conducted the stop of Orozco's truck that it was "common knowledge that if you suspect criminal activity, that you can use your administrative powers to make a stop."

Notwithstanding the temptation for law enforcement officers to use their administrative powers as a pretext to investigate criminal activity, we previously held that a comparable Missouri scheme involving random, suspicionless inspection stops of commercial vehicles was valid. *See United States v. Delgado*, 545 F.3d 1195 (9th Cir. 2008). We based our holding in part on the fact that "[t]he privacy expectations of commercial truck drivers are markedly less than those of the public in general. The trucking industry is highly regulated and drivers have long been subjected to federal regulation of their qualifications." *Id.* at 1201 n.3 (internal quotation marks omitted).

Prior to *Delgado*, the Supreme Court, in *Delaware v. Prouse*, 440 U.S. 648 (1979), held that even though automobiles are subject to "pervasive and continuing governmental regulation and controls," *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976), the police could not, absent reasonable suspicion, stop individual vehicles for the purpose of checking the driver's license and the registration of the automobile. *Prouse*, 440 U.S. at 663. *Prouse*, however, made clear that it was not "preclud[ing] the State of Delaware or other States from developing methods . . . that

involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative." *Id.* Moreover, as Justice Blackmun observed in his concurring opinion, other alternatives include "not purely random stops (such as every 10th car to pass a given point) that equate with, but are less intrusive than, a 100% roadblock stop." *Id.* at 664 (Blackmun, J., concurring). Thus, *Prouse* holds "only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the *unbridled discretion of police officers*." *Prouse*, 440 U.S. at 663 (emphasis supplied). What *Prouse* therefore requires "are neutral selection criteria within a system which does not carry with it any significant chance of undetectable subterfuge." 5 WAYNE R. LEFAVE, SEARCH AND SEIZURE, 410–11 (5th ed. 2012).

The stop of Orozco's commercial truck demonstrates why, as a practical matter, such "neutral selection criteria" may in fact be necessary to withstand the temptation for law enforcement officers to use their administrative powers as a pretext, and to defend against a claim that a search was pretextual.

## II.  The Stop of Orozco's Commercial Truck

At some point in spring 2013, Trooper Adam Zehr stopped a commercial trucker, who indicated that he had information relating to a trucking company that could possibly be transporting drugs. Zehr put this tipster in contact with Detective Sergeant Chris Brewer, of the Nevada Division of Investigations. Shortly thereafter, on April 26, Brewer received a call from the tipster regarding a specific commercial truck that "may possibly have controlled

substances." The tipster told Brewer that this truck was red, with a white box trailer and Michigan license plates.

The next day, April 27, 2013, the tipster again contacted Brewer to provide an approximate time when the tractor-trailer would be traveling through White Pine County, Nevada, where Brewer was stationed. After receiving this information, Sergeant Brewer "immediately" contacted Trooper Zehr to "advise[] him of the vehicle and its location," and told him "that he would have to develop his own probable cause to get the vehicle stopped" because "there could possibly be drugs in the vehicle," but "[t]here was nothing solid." Trooper Boynton testified that, at the time of the stop, he knew "through some hearsay that there was a tip about some possible transportation of narcotics." Moreover, Trooper Zehr testified that at least one of the reasons that he made the stop was because he had been advised that Orozco's vehicle was "possibly engaging in criminal activity and could possibly have drugs in the vehicle."

After Zehr's conversation with Brewer, Zehr and Trooper Boynton "knew to be on the lookout for" Orozco's truck. They drove out to Mile Post 37 in White Pine County to wait for it. When the truck arrived, Zehr had to pull out behind a different commercial truck and drive past it in order to pull over Orozco's truck. Indeed, Troopers Zehr and Boynton acknowledged that, even before they saw the truck, they planned to stop it. Thus, Zehr gave the following testimony:

> Q: Do you recall what your conversations were with Trooper Boynton about locating and stopping this truck?
>
> A: Yes.

Q: And what were those?

A: If the truck is located, we'll both stop it, or one of us will stop it, or one of us will be close for backup for a more high risk traffic stop.

Around 4:30 PM, as expected, they saw a red truck with Michigan license plates drive past Mile Post 37. Zehr, taking the lead, pulled the truck over. Boynton also pulled his car behind the truck and assisted Zehr in questioning Orozco.

Although the troopers chose to target Orozco's truck because of the information in the tip, Zehr and Boynton went through the motions of performing a NAS Level III paperwork inspection. Notwithstanding numerous violations of the commercial vehicle regulations discovered in the course of the paperwork inspection, they did not issue a citation. Instead, while the inspection was ongoing, Zehr instructed Trooper Kelly Barney ("Barney"), another police officer who was stationed nearby with a drug-sniffing dog, to call the El Paso Intelligence Center ("EPIC") (an inter-agency facility that provides intelligence support to law enforcement) regarding Orozco's truck. Barney called EPIC, and learned that Orozco had made several recent border crossings. Zehr and Barney also discussed the possibility of performing a canine sniff of the tractor-trailer, using the drug-sniffing dog. Although they did not issue a citation, they did ask for, and obtain, consent to search the tractor-trailer. Barney then arrived with the dog, who made a positive alert as to the presence of drugs, which was confirmed when the troopers found a duffel bag containing twenty-six pounds of methamphetamine and six pounds of heroin in the sleeper compartment.

### III.     The Motion to Suppress and The District Court's Ruling

Prior to trial, Orozco moved to suppress the drug evidence on the ground that the NAS level III inspection was an impermissible pretext "motivated by a desire to search for evidence of drug trafficking, rather than to conduct a commercial vehicle inspection." *United States v. Orozco*, No. 3:13-cr-48, 2015 WL 370091, at *3 (D. Nev. Jan. 28, 2015). The district court acknowledged that information from an informant that Orozco was possibly carrying narcotic drugs "was part of the reason Trooper Zehr stopped Orozco's vehicle for an administrative inspection." *Id.* Nevertheless, because Zehr testified that he also initiated the stop "to conduct a safety inspection," the district judge framed the question presented as "whether such dual purposes render an otherwise valid administrative stop illegal." *Id.* She did so without undertaking an analysis of the objective evidence to determine that Zehr's testimony was credible. Thus, she went on to hold that "an officer having dual motives does not make a warrantless search pretextual, so long as it is conducted pursuant to a lawful administrative scheme with a constitutionally permissible motivation." *Id.* at *4. Because NAS Level III safety inspections are part of a facially valid administrative scheme, the district judge held that the stop of Orozco's truck was lawful.

On this appeal from a judgment convicting him of two counts of possession with intent to distribute a controlled substance for which he was sentenced to 192 months in prison, Orozco argues that the district court erred by denying his motion to suppress on the ground that the "NAS Level III inspection" was a pretext to investigate criminal activity. We agree with the district court that a dual motive for a

suspicionless stop does not necessarily render it impermissible. Nevertheless, we reverse the denial of Orozco's motion to suppress and vacate his judgment of conviction, because the objective evidence clearly demonstrates that, but for the officers' belief that Orozco might be carrying drugs, the stop never would have happened.

## DISCUSSION

The Fourth Amendment protects against "against unreasonable searches and seizures." U.S. Const. amend. IV. "It is well established that a vehicle stop . . . effectuates a seizure within the meaning of the Fourth Amendment." *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000); *see also Brower v. Cty. of Inyo*, 489 U.S. 593, 596–97 (1989) (holding that a Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement *through means intentionally applied*"). Where the circumstances of a vehicle stop, viewed objectively, are sufficient to justify the detention based on either reasonable suspicion or probable cause that a crime has been committed, the subjective intent of the law enforcement officers is irrelevant. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011).

We do not decide whether the Nevada troopers had reasonable suspicion for the stop, because the U.S. Attorney waived this argument by failing to address it in his answering brief. *See United States v. Gamboa-Cardenas*, 508 F.3d 491, 402 (9th Cir. 2007) (holding that an argument not addressed in an answering brief is waived). For the purposes of this appeal, we assume there was no reasonable suspicion for the stop.

A different rule applies to "special-needs and administrative-search cases, where 'actual motivations' *do* matter." *Id.* (quoting *United States v. Knights*, 534 U.S. 112, 122 (2001) (emphasis supplied). Significantly, in *New York v. Burger*, 482 U.S. 691 (1987), the Supreme Court upheld a regulatory scheme allowing for warrantless inspection of automobile junkyards. Such inspections required neither probable cause nor reasonable suspicion because the New York Legislature had a "proper regulatory purpose[] for enacting the administrative scheme" authorizing warrantless inspections of vehicle dismantling businesses, and because the statute authorizing the search "was not . . . a 'pretext' to enable law enforcement authorities to gather evidence of penal law violations." *Id.* at 716–17 n.27. More significantly, the *Burger* Court observed that there was "no reason to believe" that the inspection in that case "was actually a 'pretext' for obtaining evidence of respondent's violation of the penal laws." *Id.* (citations omitted).

Indeed, in *Whren v. United States*, the Supreme Court acknowledged its past "disapproval of police attempts to use valid bases of action against citizens as pretexts for pursuing other investigatory agendas." 517 U.S. 806, 811 (1996). Thus, it observed that, "in *Florida v. Wells*, 495 U.S. 1, 4 (1990), we stated that 'an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence'; that in *Colorado v. Bertine*, 479 U.S. 367, 372 (1987), in approving an inventory search, we apparently thought it significant that there had been 'no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation'; and that in *New York v. Burger*, 482 U.S. 691, 716–717 n. 27 (1987), we observed, in upholding the constitutionality of a warrantless administrative inspection, that the search did not appear to be

'a "pretext" for obtaining evidence of . . . violation of . . . penal laws.'" *Id.* (ellipses in original).

Similarly, the Supreme Court held in *South Dakota v. Opperman*, 428 U.S. 364 (1976), that "there is no suggestion whatever that this standard [inventory search] procedure, essentially like that followed throughout the country, was a pretext concealing an investigatory police motive." *Id.* at 376. And again, in *Edmond*, decided after *Whren*, the Supreme Court took cognizance of its disapproval of pretextual searches that were undertaken pursuant to valid administrative schemes. 531 U.S. at 45. More recently, the Supreme Court held that although "[a] judicial warrant and probable cause are not needed where the search or seizure is justified by special needs, beyond the normal need for law enforcement," *al-Kidd*, 563 U.S. at 736 (internal quotation marks omitted), "those exceptions do not apply where *the officer's purpose* is not to attend to the special needs or to the investigation for which the administrative inspection is justified." *Id.* at 737 (emphasis supplied).

Because of this "reluctan[ce] to recognize exceptions to the general rule of [requiring] individualized suspicion where governmental authorities primarily pursue their general crime control ends," *Edmond*, 531 U.S. at 43, the Supreme Court, in *Edmond*, extended the inquiry into purpose from individual stops to checkpoint programs themselves. Thus, *Edmond* did not involve a challenge to a particular administrative search on the ground that the administrative rationale was a pretext. Instead, the plaintiffs sought injunctive relief to stop the City of Indianapolis from conducting a program of roadblock stops, for which reasonable suspicion was not required. *Id.* at 36. This scheme had the primary programmatic purpose of "the discovery and interdiction of illegal narcotics." *Id.* at 34.

Stops made for this purpose, the plaintiffs argued, could only be made based on reasonable suspicion or probable cause. The City argued that the intrusion occasioned by such a stop was the same as if the roadblocks were designed solely to check for a license or the intoxication of the driver—and therefore could be justified without reasonable suspicion as a special needs or administrative search. *Id.* at 47–48. The City argued that "where the government articulates and pursues a legitimate interest for a suspicionless stop, courts should not look behind that interest to determine whether the government's 'primary purpose' is valid." *Id.* at 45 (internal quotation marks omitted).

The Supreme Court rejected this argument and held that the programmatic purpose of an administrative scheme "may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion." *Id.* at 45–46. An inquiry into programmatic purpose was necessary because, "in determining whether individualized suspicion is required, we must consider the nature of the interests threatened and their connection to the particular law enforcement practices at issue." *Id.* at 42–43. Ultimately, after considering the nature of the interest threatened—"the severe and intractable nature of the drug problem," *id.* at 42— the Supreme Court held that the narcotics detection could not be justified as a valid administrative purpose.

While *Edmond* had no occasion to address directly the purpose of law enforcement officers who act to enforce a *valid* administrative scheme, there is one arguably ambiguous sentence at the end of the opinion in which the Supreme Court cautioned that "the purpose inquiry in this context is to be conducted only at the programmatic level and is not an

invitation to probe the minds of individual officers acting at the scene." *Id.* at 48. We do not read this dictum as undermining the long line of Supreme Court cases demonstrating a concern for pretext, even where searches or seizures are undertaken by those charged with enforcing a valid administrative scheme. Instead, it appears to apply, as the Supreme Court said, "in this context"—namely, in the context of an invalid programmatic scheme like the one at issue in *Edmond*. In *this* context, because the drug checkpoint scheme violates the Fourth Amendment, the fact that the individual officer is not looking for evidence of crime will not salvage the validity of a suspicionless stop.

The present case involves the inverse of *Edmond.* Because the programmatic purpose of the Nevada inspection scheme may be valid, a stop undertaken in furtherance of that purpose does not violate the Fourth Amendment, even if reasonable suspicion or probable cause is lacking. Nevertheless, it could hardly be that a suspicionless stop made for reasons unrelated to the programmatic purpose of the scheme is valid simply because it is undertaken by those charged with enforcing that scheme. Indeed, that is why, as we have shown, when the Supreme Court has upheld particular administrative or special needs programs, it has consistently observed that those programs, and the searches and seizures conducted pursuant to them, did not appear to be pretexts for obtaining evidence of criminal activity. Otherwise, a valid programmatic purpose, as in the present case, which confers "unbridled discretion [on] police officers," *Prouse*, 440 U.S. at 663, would become a license to undertake pretextual stops of commercial vehicles for evidence of criminal activity or any other impermissible reason, such as the race or nationality of the driver. *Cf. United States v. Carrizoza-Gaxiola*, 523 F.2d 239, 240 (9th

Cir. 1975) (listing as one of the reasons for a stop that the driver "appeared to be Mexican").

The Supreme Court's express concern that programmatic searches not be used as a pretext necessarily requires an inquiry into an officer's purpose in conducting a stop or search without reasonable suspicion or probable cause, when such an intrusion is sought to be justified pursuant to the administrative search doctrine, and where the defendant has come forward with objective evidence to suggest that the intrusion was not made for the purpose of enforcing the administrative inspection scheme. Indeed, our precedents support the need for such an inquiry. Thus, while we have declined to inquire into an officer's subjective purpose in the absence of "objective evidence supporting a charge of pretext," *United States v. Wilson*, 7 F.3d 828, 833 (9th Cir. 1993); *see also United States v. Soyland*, 3 F.3d 1312, 1314 (9th Cir. 1993); *United States v. Koshnevis*, 979 F.2d 691, 694 (9th Cir. 1992); *United States v. Barnett*, 935 F.2d 178, 181 (9th Cir. 1991), we have found pretext where the police officers admitted that their subjective purpose was to find evidence of crime. *See United States v. Hellman*, 556 F.2d 442, 444 (9th Cir. 1977) ("Here it is clear from the testimony of the searching officer that the citation, the impounding and the inventorying [of the defendant's vehicle] all were for 'an investigatory police motive.' This alone is sufficient to conclude that the warrantless search of the car was unreasonable.").

We emphasize that the presence of a criminal investigatory motive, by itself, does not render an administrative stop pretextual. *See United States v. Tsai*, 282 F.3d 690, 695 (9th Cir. 2002); *see also United States v. Goldfine*, 538 F.2d 815, 819 (9th Cir. 1976) (declining to

adopt rule that agent can only conduct search if and only if he had no reason to suspect a possible violation of law). Nor does a dual motive—one valid, and one impermissible. "More is involved than the mere expectation that incriminating evidence might be found; the pretext arises out of the fact that the evidence is found in a search which would not have occurred at all . . . ." 3 WAYNE R. LEFAVE, SEARCH AND SEIZURE 902 (5th ed. 2012). Thus, "[w]e apply an objective test to determine whether a stop made for an ostensibly legal reason is a pretext for what is, in reality, an impermissible reason." *United States v. Maestas*, 2 F.3d 1485, 1489 (10th Cir. 1993) (citations omitted). More specifically, "we ask whether the officer *would* have made the stop in the absence of the invalid purpose. Thus, in order to prove that a stop is unreasonably pretextual, a defendant must show that the stop would not have occurred in the absence of an impermissible reason." *Id.* (citations omitted) (emphasis in original). Orozco has met his burden of making such a showing here.

The objective evidence clearly establishes that the only reason for the stop was the officers' belief that Orozco could possibly be hauling marijuana or methamphetamine in his tractor-trailer. We focus on two such sources of evidence. First, the manner in which the stop itself was conducted strongly suggests that it was wholly pretextual. Briefly, as discussed above, after receiving a tip about the location of Orozco's truck, Sergeant Brewer "immediately" contacted Trooper Zehr to "advise[] him of the vehicle and its location." After this conversation, the troopers drove out to Mile Post 37 in White Pine County, to "be on the lookout for" Orozco's truck. Thus, but for the tip, the officers would not even have been in position to stop the truck. When the truck arrived, Zehr had to pull out behind a different commercial truck and

drive past it in order to pull over Orozco's truck. Indeed, arrangements had apparently been made for a drug-sniffing dog to be stationed less than a mile away.

Second, we find significant Trooper Boynton's testimony regarding the use of administrative inspections as a pretext to investigate criminal activity, and more specifically, his testimony regarding "common knowledge." We disagree with the district court's suggestion that it was common knowledge only that *Troopers Zehr and Boynton*, as opposed to Nevada troopers in general, understood that they could use administrative inspections to investigate criminal activity. That reading simply cannot be reconciled with the language Boynton used: when law enforcement officers testify that it is "common knowledge that you can do that," they are obviously referring to knowledge of practices possessed by those officers charged with enforcing the administrative scheme.

Moreover, even if the "common knowledge" were limited to the practice followed by Zehr and Boynton, the failure of their superiors to stop them from using the scheme in this way may be sufficient to elevate it to a policy and practice that precludes reliance on an otherwise valid administrative scheme. As Judge Kozinski has observed, citing cases relating to 42 U.S.C. § 1983,[1] which impose liability on

---

[1] *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988) (plurality opinion) (potential section 1983 liability "if a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware"); *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir.1992) (custom or informal policy may be proven through "evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded"); *Oviatt by and through Waugh v. Pearce*, 954 F.2d 1470, 1477 (9th Cir.1992)

municipalities and supervisory officers for their policies, customs, and practices, "[w]hile these cases arise in a somewhat different context, they provide an apt analogy to our situation.  Because administrative searches are so easily diverted from their narrowly defined purposes, government officials have an affirmative responsibility to keep them from being misused.  Acquiescence in a custom or practice that routinely disregards the limits of particular administrative searches might itself be sufficient to establish a breach of this responsibility." *United States v. Soyland*, 3 F.3d 1312, 1318 n.11 (9th Cir. 1993) (Kozinski, J., *concurring in part and dissenting in part*).[2]  Nevertheless, even under the crabbed construction the district judge placed on Boynton's testimony regarding "common knowledge," it significantly adds to the objective evidence that the stop in this case was pretextual.

Indeed, our conclusion that the stop was pretextual is buttressed by the Assistant U.S. Attorney's oral concession that, but for the tip, the officers would not have stopped the defendant's truck.  United States Court of Appeals for the Ninth Circuit, *15-10385 USA v. Victor Orozco*, YOUTUBE (Oct. 20, 2016), https://www.youtube.com/watch?v=MUC

---

(policymaker's inaction in face of problem constituted policy for purposes of section 1983 liability).

[2] The *Soyland* majority did not take issue with Judge Kozinski's argument.  Instead, it observed that "[the defendant] does not argue and no objective evidence demonstrates" that the Border Patrol, "in establishing the checkpoint, intended to search for illegal drugs under the pretext of searching for undocumented aliens." 3 F.3d at 1314.  Under the circumstances, it had "no occasion to address the issue of whether checkpoint officers routinely overstep their authority by conducting pretextual narcotics searches." *Id.*  Judge Kozinski argued that the defendant was entitled to discovery on this issue.  *Id.* at 1319.

AvREwbTs, at 18:30–19:30.  In a post-argument letter, he sought to retract that concession in a way that only reinforced it, writing: "I would have been correct to say that the officers had no other specific reason to choose defendant's truck for an administrative inspection."  ECF No. 44.

*United States v. McCarty*, 648 F.3d 820 (9th Cir. 2011), as amended (Sept. 9, 2011), upon which the district court relied, does not hold that a pretextual stop is valid simply because law enforcement officers can point to a valid programmatic scheme that they are charged with enforcing. In that case, McCarty checked bags that were subject to a mandatory TSA screening process.  They were scanned using a CTX 5500 DS security x-ray machine, which alerted TSA officials that one of the bags had an unusually dense item that, under TSA policy, automatically required further inspection.  *Id.* at 824.  In one of the envelopes in the bag, a screener found photographs that looked "improper" because they depicted nude children.  *Id.* at 836–37.  One of the screeners also read lines from newspaper clippings and letters in McCarty's bag in order to determine whether children had been harmed.  *Id.*

This conduct persuaded the district court in that case that the TSA screener "searched the photographs in the envelope not for sheet explosives but for evidence of child pornography."  *United States v. McCarty*, 672 F. Supp. 2d 1085, 1097 n.8 (D. Haw. 2009), *vacated*, 648 F.3d 820 (9th Cir. 2011), as amended (Sept. 9, 2011).  Significantly, it accepted testimony "that a packet of photographs may cause a dense item alarm and TSA protocol requires the TSA employee to ensure that the photographs do not include any sheet explosives."  *Id.* at 1098.  Nevertheless, it found that the testimony "does not establish that [the TSA employees]

examined the photographs for sheet explosives—rather, after they noticed the photographs that were initially visible they inspected the *content* of additional photographs for the purpose of determining their criminal nature." *Id.* (emphasis in original).

We agreed with the district court in that case that "the scope of the permissible search—mandated by the TSA protocol—was defined by the point at which the screener was convinced the bag posed no threat to airline safety." *McCarty*, 648 F.3d at 836. More specifically, a TSA screener is "*required* to leaf or thumb through the stack of photographs until she is sure there are no sheet explosives." *Id.* at 825 (emphasis supplied). Nevertheless, we reversed as clearly erroneous the district court's finding that the TSA screener "searched the photographs in the envelope not for sheet explosives but for evidence of child pornography," *McCarty*, 672 F. Supp. 2d at 1097 n.8—a finding for which we could find "no support in the record." *McCarty*, 648 F.3d at 836. Once the district court's factual finding was reversed, *McCarty* became an easy case.[3] Thus, even an "unlawful secondary search purpose" does not "invalidate [an] otherwise lawful administrative . . . search" when, as in *McCarty*, "the searching officer's actions would have been the same regardless of his true motivation." *Id.* at 833 (citations and internal quotation marks omitted); *see also*

---

[3] Our finding in *McCarty* was comparable to the factual finding in *Colorado v. Bertine*, where the Supreme Court emphasized that "the trial court found that the Police Department's procedures mandated the opening of closed containers and the listing of their contents." 479 U.S. at 374 n. 6. And that, accordingly, an inventory search conducted pursuant to the mandated procedures complied with the Supreme Court's consistently articulated "requirement that inventories be conducted according to standardized criteria." *Id.*

*United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993) ("When the police conduct would have been the same regardless of the officer's subjective state of mind, no purpose is served by attempting to tease out the officer's 'true' motivation.") (citing *Horton v. California*, 496 U.S. 128 (1990)).

We observe that our inquiry into the purpose of the search of the photographs would have been unnecessary if the purpose of the TSA screener was irrelevant simply because the justification proffered for the search was that it had been undertaken pursuant to a valid administrative program—a position that *McCarty* appeared to have accepted at an earlier point in its discussion of the applicable law. There, we read *City of Indianapolis* v. *Edmond* as suggesting that where "the search is 'undertaken *pursuant to a general scheme without individualized suspicion*,'" *al-Kidd*, 131 S.Ct. at 2081 (quoting *Edmond*, 531 U.S. at 45–46, 121 S.Ct. 447), consideration of the government actor's actual motivation has been limited to an inquiry into the programmatic purposes motivating the search." *Id.* at 832–33 (emphasis in original). Our discussion of *Edmond*, above, analyzed this dictum. Nevertheless, to the extent that *McCarty* suggests that the *Edmond* dictum precludes an inquiry into pretext, that view would beg the question of whether a particular search was in fact "undertaken pursuant" to a valid administrative scheme, or whether the invocation of the scheme was wholly pretextual—an inquiry that a line of Supreme Court and Ninth Circuit cases say is necessary, and that *McCarty* actually undertook.

Turning back to the case at hand, the only purpose of the stop of Orozco's truck was to investigate criminal activity. There was no secondary administrative purpose at all—only

a charade to camouflage the real purpose of the stop. Indeed, the present case is distinguishable from *McCarty* principally because it involved a seizure that would not have taken place were it not for the fact that the officers intended to search for evidence of criminal activity. While we reject the district judge's finding the Nevada troopers had a "dual motive" for stopping Orozco's truck, her holding that "having dual motives does not make a warrantless search pretextual" avoids the critical question whether the stop of Orozco's truck would have been made at all if the Nevada troopers were not acting on the information that it was "possibly" carrying drugs. The objective evidence demonstrates that the answer to that question is no.

## CONCLUSION

The judgment of conviction is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this opinion.