# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 50470

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Boise, June 2023 Term** |
| | ) | |
| **v.** | ) | **Opinion Filed: September 29, 2023** |
| | ) | |
| **APRIL DAWN RAMOS,** | ) | **Melanie Gagnepain, Clerk** |
| | ) | |
| **Defendant-Appellant.** | ) | |

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Bingham County. Darren B. Simpson, District Judge.

The decision of the district court is <u>vacated</u>, and the case is <u>remanded</u>.

Erik R. Lehtinen, Interim State Appellate Public Defender, Boise, for Appellant, April Dawn Ramos. Brian R. Dickson argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent, State of Idaho. Kacey L. Jones argued.

———————————————

STEGNER, Justice.

This appeal concerns the denial of a motion to suppress. While on patrol, Bingham County Deputy Sheriff Brock Katseanes discovered an unattended car parked in the parking lot of a public boat launch. The car was unlocked, and its trunk and front windows were open. After relaying the license plate number to police dispatch, Katseanes was informed that the car was registered to April Ramos. Katseanes was acquainted with Ramos from previous interactions. Katseanes searched through the trunk and back seat of Ramos's car, ostensibly trying to locate Ramos. Katseanes was eventually joined by five additional officers and a canine to search the surrounding area for Ramos, but they were unsuccessful in locating her.

Due to his previous encounters with Ramos, Katseanes believed that the car likely contained illegal drugs. The canine was then deployed to the car to conduct a drug sniff; however, the dog did not alert during its sniff of the car's exterior. Katseanes then remarked that the car was

1

parked in an "accessible" parking spot.[1] The officers subsequently impounded the car and then conducted an inventory search of it prior to having the car towed. During the inventory search, the officers found methamphetamine and drug paraphernalia.

Ramos was charged with possession of a controlled substance and possession of drug paraphernalia. She moved to suppress all evidence found during the inventory search of the car. The district court denied her motion. Ramos conditionally pleaded guilty to possession of a controlled substance but retained her right to appeal the denial of her motion to suppress. As a result of the plea agreement, the State dismissed the possession of drug paraphernalia charge. Ramos timely appealed and her case was assigned to the Idaho Court of Appeals, which affirmed the decision of the district court in an unpublished opinion. *State v. Ramos*, No. 48473, 2022 WL 2375831, at *1 (Idaho Ct. App. July 1, 2022, *as amended* Sept. 2, 2022). Ramos subsequently petitioned this Court for review, which we granted. For the reasons discussed below, we vacate the decision of the district court and remand the case for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

On October 21, 2019, Brock Katseanes, a deputy sheriff employed by the Bingham County Sheriff's Office, drove his patrol car into the parking lot of the Tilden Boat Ramp. He then noticed a car parked next to the public restroom. Katseanes later testified that the driver of the car looked as if she was "about to leave, decided not to, [then] backed up into [the parking] spot." It appears from the body cam footage included in the record on appeal that Katseanes was parked with his windshield facing the front of the car. As Katseanes observed the scene, "[t]he trunk opened up[,]" and it appeared that someone "was fiddling around with something in the back" of the car, reaching far into the back of the trunk. Katseanes saw the person's feet under the car and then they "kind of disappear[ed], like they were going up into the trunk." The feet then reappeared and "went out the backside of the car to the driver's side, [it] looked like they were crouched down by the tire."

Thinking that the driver possibly needed help with a flat tire, Katseanes approached the car. The car was unlocked, the trunk was still open, and the two front side windows were rolled

---

[1] According to the Americans with Disabilities Act National Network ("the ADANN"), "'handicapped' is an outdated and unacceptable term to use when referring to individuals or accessible environments." *Guidelines for Writing about People with Disabilities*, ADA NAT'L NETWORK, https://adata.org/factsheet/ADANN-writing (last updated April 2023). Accordingly, except when discussing a direct quote, this opinion will follow the ADANN's suggested convention and refer to what was formerly referred to as "handicapped parking" as "accessible parking." *See id.*

down, but no one was there. Katseanes then relayed the car's license plate number to police dispatch, which informed him the vehicle was registered to April Ramos. Katseanes was acquainted with Ramos and knew that she had an outstanding felony warrant.[2] Katseanes requested back-up, including a canine to track Ramos.

At that point, Katseanes began to search the area immediately next to the car for Ramos, taking care not to disturb the surrounding sagebrush area too much in order to better facilitate the canine search effort. While waiting for other officers to arrive, Katseanes went through the belongings in the open trunk multiple times and opened the back passenger-side door to search through the belongings in the back seat. Katseanes also called out to Ramos several times with warnings such as "April, you need to come out, we're going to send the dog out here."

Within a few minutes of Katseanes's request for back-up, Corporal Jeremy Kendall of the Bingham County Sheriff's Office arrived on the scene. Both Katseanes and Kendall looked through the belongings in the open trunk and searched the surrounding parking lot area. Katseanes requested that Kendall patrol the road next to the parking lot in case Ramos was there seeking a ride from someone else. Before Kendall could leave, Sergeant Yancey[3] of the Bingham County Sheriff's Office pulled his police vehicle into the parking lot. The three officers continued to search the parking lot as they waited for the canine handler and his dog, Duko, to arrive.

As the fourth police officer, Detective Dalley[4] of the Bingham County Sheriff's Office, pulled his vehicle into the parking lot, Katseanes opened the front passenger side door of Ramos's car and found an empty Ziploc-style plastic bag on the floor. Katseanes explained the situation to Dalley, and Dalley walked to the open window of the front passenger side door. As Dalley peered inside the car, Katseanes pointed to the driver's seat and remarked, "I think there's a baggie in that glove too."

Dalley responded, "It's got the 'I got drugs smell' in there too."

"Oh yeah," Katseanes agreed, "she's been living out of it."

Dalley confirmed that he knew Ramos as well, and Katseanes explained that he had not searched too far into the sagebrush area next to the car for fear he would interfere with Duko's tracking ability. "Don't wanna [sic] do too much," Katseanes explained.

---

[2] It is unclear from the record why Ramos had an outstanding felony warrant. There is mention of a possible probation violation, however, the precise nature of the outstanding felony warrant is unknown from the record.
[3] Yancey's first name is not included in the record.
[4] Dalley's first name is not included in the record.

"I do wanna [sic] see Duko bite her f*cking face off though," Dalley replied.

Katseanes laughed and gestured to his body-camera, which was recording. Dalley responded, "Oh yeah. Yeah, I realized that after I said that. My bad." Once again, Katseanes laughed.

Two more police vehicles pulled into the parking lot. The fifth officer, Corporal Croxford[5] of the Bingham County Sheriff's Office, walked up to Katseanes and asked if a drone would be useful in locating Ramos. Katseanes responded that he thought a drone "wouldn't hurt" but said he did not think Ramos had gone far. While Katseanes was recounting the events of the search effort to Croxford, the sixth officer and canine handler, Bingham County Deputy Sheriff Miller,[6] joined the group.

As the officers discussed the possible routes Ramos could have taken away from the car, Croxford again asked if they wanted to use a drone. Katseanes explained that he thought the dog could get a scent to track Ramos because the officers had tried not to disturb the sagebrush.

"If he sniffs her, he's gonna [sic] bite her," Croxford replied. He grinned and continued: "That last one ended up in surgery, but it is what it is."

Miller retrieved Duko from his vehicle, and Duko led Miller on a sniff search through the sagebrush and surrounding area, including to a nearby house and farm. Katseanes followed behind them. The initial sniff search lasted approximately twenty minutes. It was ultimately unsuccessful.

Miller, Duko, and Katseanes returned to the parking lot. While Miller went to his vehicle to get a "tracking collar" for Duko, Dalley asked Katseanes what he wanted to do with Ramos's car. Katseanes answered, "Well, I'm gonna [sic] say we're probably gonna [sic] tow it because I'm sure we're probably gonna [sic] find narcotics in there. So once we do that, then we'll tow it."

Miller took Duko to the open trunk of Ramos's car to get Ramos's scent. Duko, Miller, and Katseanes then began conducting another sniff search of the area. As later explained by the district court, "Duko . . . tracked into the dense sage, underbrush, and trees toward and along the Snake River. Duko explored the steps leading down to the river and the private back yards of neighboring properties before being brought back to the parking area some fifteen (15) to twenty (20) minutes later."[7]

---

[5] Croxford's first name is not included in the record.
[6] Miller's first name is not included in the record.
[7] It appears from the body cam footage that the second sniff search actually lasted around twelve minutes.

Miller put Duko back into his vehicle and joined Katseanes at Ramos's car. Looking through the open front passenger side window, Katseanes remarked, "See, there's that glove right here." Several minutes later, Miller retrieved Duko from his vehicle and had Duko perform a drug sniff around the exterior of Ramos's car.

During the sniff search, the other officers gathered next to the car to discuss next steps. Croxford asked Katseanes what he wanted to do with the car, having been unsuccessful in their search for Ramos.

"Probably tow it," answered Katseanes. Katseanes then asked Miller if Duko "got a hit on the inside," to which Miller answered in the negative. "Oh, okay," Katseanes responded, as he again looked through the open window at the front seats of the car.

"Well, she's a trickster, she wins this one," Yancey commented.

"She got lucky," Katseanes agreed. "Still wanna [sic] know what's in that glove though."

One of the officers responded, "I'll tell you when we do a tow inventory."

"There you go," said Katseanes.

During this conversation, Miller continued to have Duko sniff around the car. One of the officers remarked, "She coulda [sic] at least parked away from the bushes a little bit."

"Yeah, I think it's in, uh, handicap parking too," Katseanes responded.

"It is," the officer agreed. The other officers agreed as well. "Well, we're obligated now," the officer stated.

At some point after that conversation, Katseanes called a tow truck. The officers then searched Ramos's car and discovered methamphetamine and drug paraphernalia.

## B. Procedural Background

The State filed a Criminal Complaint against Ramos, asserting that she had unlawfully possessed methamphetamine (Count I) and drug paraphernalia (Count II). The State subsequently filed a Criminal Information alleging the same two counts. Ramos moved to suppress "all evidence . . . obtained as the result of the search of [Ramos]'s vehicle on the basis that law enforcement searched her vehicle without a warrant and without her permission and no exception to the warrant requirement applies to justify the search." The State conceded it had not obtained a warrant prior to the search, but it maintained "the search [fell] under the vehicle exception and the inventory exception" to the warrant requirement. At no point in its memorandum did the State mention the fact that the car had been left in accessible parking.

5

The matter proceeded to a hearing before the district court. The district court concluded that, having reviewed Ramos's motion to suppress and the accompanying affidavit, the burden had shifted to the State to "demonstrate that the search either fell within a well-recognized exception to the warrant requirement or was otherwise reasonable under the circumstances." *See State v. Hoskins*, 165 Idaho 217, 221, 443 P.3d 231, 235 (2019) (quoting *State v. Weaver*, 127 Idaho 288, 290, 900 P.2d 196, 198 (1995)).

The State called Katseanes as its only witness. Katseanes testified that, before the officers searched the car, they decided the car needed to be towed:

> It was parked in a no parking zone. It was used in the commission of a crime. When [Ramos] left, we felt we were somewhat liable for the car. It ultimately was community caretaking as well because the windows were down, the trunk was open, it was full of property. If we would have left it there, I felt that you'd have stuff stolen, the car possibly stolen. That area is a bad area and we continually have issues with car burglaries, malicious injuries, stuff of that nature.
>
> . . . .
>
> The concerns were it was an unsecured vehicle, the windows were down, the trunk was open, it was full of property. For all I know, it could have had a million dollars in one of the bags in the trunk and we could have left it there. So it was in her best interest, I felt, to tow the vehicle as well.

Katseanes further testified that he did not think the officers could have simply secured the car and left it in the parking lot:

> I felt in order to roll up some of those windows, the door mounts were broken, I don't know if it was securable. There was [sic] a lot of issues it seemed like with the car. Then once again, the liability of leaving that car there, I don't know. It was in a no parking zone. I felt like it could be a victim of malicious injury or burglary as well there.

During cross-examination, Katseanes explained why he believed the car to be in a no-parking zone: The tires on the passenger side of the car were parked outside of the parking spot on yellow, diagonal lines. However, Katseanes did not testify during the motion to suppress hearing whether the parking spot was reserved for accessible parking, nor did the State argue that the car was parked in an accessible parking space.

Ramos testified briefly at the hearing as well. She testified that there was a sign in the parking lot that led her to believe she was able to park her car in the parking lot for forty-eight hours. The district court admitted into evidence two photos that Ramos submitted of a sign which

6

stated that "leav[ing] a vehicle and/or trailer unattended for more than 48 hours" was a "prohibited activity[.]"

After listening to counsels' arguments on the motion to suppress, the district court remarked that, while it could "see the lines in the [body-cam] video[,]" it would "really like to see that parking spot without a vehicle on it." Neither attorney objected, so the district court made plans to view the parking spot in person prior to rendering its decision on Ramos's motion to suppress. Upon visiting the Tilden Boat Ramp parking lot, the district court found that the parking spot was designated as an accessible parking space.

In a written decision, the district court denied Ramos's motion to suppress pursuant to the inventory exception to the Fourth Amendment's warrant requirement. The district court found that, while "Ramos' right, rear tire lay a few inches into the no-parking zone[,] . . . [s]uch a minor infraction fail[ed] to support a reasonable basis to tow Ramos' vehicle for a parking violation." However, the district court then explained that "[v]ehicles parked in violation of a handicap designation may be towed" pursuant to Idaho Code section 49-213(2). The district court further noted that "Ramos' car [did] not appear to have a handicap designation." (Footnote omitted.)

In conclusion, the district court determined that Katseanes's decision to tow Ramos's car was objectively reasonable. The district court explained that Katseanes "had the following facts at hand" when he decided to tow Ramos's car:

> Ramos appeared to hide, and then flee, when Deputy Katseanes entered the Tilden Boat Ramp parking lot. Ramos had an outstanding felony warrant. A canine search of the area around the parking lot failed to locate Ramos. Ramos left [the] windows down and the trunk open, with belongings visible. Ramos did not return to the car in the approximately one (1) hour and thirty (30) minutes that police officers remained on the scene before calling the tow truck. Ramos' car was illegally parked in a handicap parking space. Further, the Tilden Boat Ramp parking lot is a dangerous area for car burglaries.

Relying on the decision by the Idaho Court of Appeals in *State v. Stewart*, 152 Idaho 868, 276 P.3d 740 (Ct. App. 2012), the district court reasoned that these facts rendered Katseanes's decision to tow the car objectively reasonable. Thus, "based upon the narrow set of circumstances presented in this case," the district court denied Ramos's motion to suppress under the inventory exception to the warrant requirement.

Ramos conditionally pleaded guilty to possession of methamphetamine, reserving her right to appeal the district court's denial of her motion to suppress. Ramos appealed the denial of her motion to suppress, and her appeal was assigned to the Court of Appeals. *Ramos*, 2022 WL

2375831, at *1. The Court of Appeals, in an unpublished opinion, affirmed the district court's denial of Ramos's motion to suppress. *Id.* Ramos subsequently petitioned this Court for review, which was granted.

## II. STANDARDS OF REVIEW

"When reviewing a case on petition for review from the Court of Appeals this Court gives due consideration to the decision reached by the Court of Appeals, but directly reviews the decision of the trial court." *State v. Gonzales*, 165 Idaho 667, 671, 450 P.3d 315, 319 (2019) (quoting *State v. Schmierer*, 159 Idaho 768, 770, 367 P.3d 163, 165 (2016)). This Court applies a bifurcated standard of review when reviewing the denial of a motion to suppress. *State v. Howard*, 169 Idaho 379, 381, 496 P.3d 865, 867 (2021). This Court accepts "the trial court's findings of fact unless they are clearly erroneous" but freely reviews "the trial court's application of constitutional principles to the facts found." *Id.* (quoting *State v. Danney*, 153 Idaho 405, 408, 283 P.3d 722, 725 (2012)).

## III. ANALYSIS

### A. The district court erred in denying Ramos's motion to suppress.

Ramos argues the officers improperly impounded her car and performed an inventory search as a pretext for their criminal investigation. She asserts that the officers' conduct prior to the search demonstrated that they intended to search her vehicle all along. She points out that, at the hearing on the motion to suppress, Katseanes never mentioned the accessible parking spot. Rather, Katseanes "testified the reason he ultimately believed the car was unlawfully parked was that one of its tires was slightly over the line into a marked no-parking space" and "unequivocally denied there were any other bases to believe the car was unlawfully parked." Ramos argues that, in upholding the officers' decision to impound her car, the district court and the Court of Appeals improperly expanded the scope of the inventory exception contrary to United States Supreme Court precedent. Pointing to *South Dakota v. Opperman*, 428 U.S. 364 (1976), and *Caniglia v. Strom*, 141 S. Ct. 1596 (2021), Ramos contends the decision to impound a vehicle remains "limited to the two historical rationales of removing cars which interfered with the flow of traffic or threatened the public[,]" neither of which were present here.

We hold that the district court erred in denying Ramos's motion to suppress. "The Fourth Amendment to the U.S. Constitution prohibits unreasonable searches and seizures." *Hoskins*, 165 Idaho at 220, 443 P.3d at 234. "Searches conducted without a warrant are considered *per se*

8

unreasonable unless they fall into one of the 'specifically established and well-delineated exceptions' to this general rule." *State v. Lee*, 162 Idaho 642, 647, 402 P.3d 1095, 1100 (2017) (quoting *State v. Bishop*, 146 Idaho 804, 815, 203 P.3d 1203, 1214 (2009)). "Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment generally may not be used against the victim of the violation." *State v. Huntley*, 170 Idaho 521, 526, 513 P.3d 1141, 1146 (2022). "When the defendant challenges the legality of a search based upon the absence of a search warrant, the burden then shifts to the State to prove the legality of the search." *Hoskins*, 165 Idaho at 221, 443 P.3d at 235 (quoting *State v. Holland*, 135 Idaho 159, 162, 15 P.3d 1167, 1170 (2000)). The State must then "demonstrate that the search either fell within a well-recognized exception to the warrant requirement or was otherwise reasonable under the circumstances." *Id.* (quoting *Weaver*, 127 Idaho at 290, 900 P.2d at 198).

One such exception to the warrant requirement is the inventory search exception. *Opperman*, 428 U.S. at 374–75. This Court has previously explained:

> When the police have lawfully impounded an automobile in carrying out their community caretaking function, they are permitted to inventory its contents. Such warrantless inventory searches, when conducted in compliance with standard and established police procedures and not as a pretext for criminal investigation, do not offend Fourth Amendment strictures against unreasonable searches and seizures. *Colorado v. Bertine*, 479 U.S. 367, 374 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 374–75 (1976); *State v. Smith*, 120 Idaho 77, 80–81, 813 P.2d 888, 891 (1991).
>
> An inventory following impoundment is a reasonable and legitimate means to safeguard the owner's property, to prevent claims against the police for lost or stolen property, and to protect the police and others from dangerous instrumentalities that may be inside the vehicle. *Bertine*, 479 U.S. at 374; *Opperman*, 428 U.S. at 372; *Smith*, 120 Idaho at 80, 813 P.2d at 891. However, the impoundment itself must be lawful. An impoundment of a vehicle constitutes a seizure and is thus subject to the limitations of the Fourth Amendment. If the impoundment violates the Fourth Amendment, the accompanying inventory is also tainted, and evidence found in the search must be suppressed.

*Weaver*, 127 Idaho at 290–91, 900 P.2d at 198–99.

*1. Ramos preserved her argument that the officers' justification for impounding her car was an impermissible pretext for conducting a criminal investigation.*

As a preliminary matter, we first address the State's assertion that Ramos failed to preserve her argument that the officers' purported justification for impounding her car was an impermissible pretext for conducting a criminal investigation. "This Court has made clear that a central rule of appellate review is that '[t]his Court will not consider issues raised for the first time on appeal.'" *Hoskins*, 165 Idaho at 221–22, 443 P.3d at 235–36 (alteration original to *Hoskins*) (quoting *State v. Garcia-Rodriguez*, 162 Idaho 271, 275, 396 P.3d 700, 704 (2017)). However, "so long as a substantive issue is properly preserved, a party's appellate argument may evolve on appeal." *Id.* at 224, 443 P.3d at 238. "A groomed horse is expected on appeal, but a different horse is forbidden." *Id.* at 225, 443 P.3d at 239 (quoting *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019)).

We conclude that Ramos has preserved her pretext argument. As noted by the Court of Appeals, Ramos's attorney made multiple comments in support of that argument before the district court. For example, Ramos's attorney began his argument to the district court by stating, "Your Honor, we believe that the evidence that was seized as a result of this stop should be suppressed. Our contention is that the inventory search was nothing more than a pretext to search the car without a warrant. They should have obtained a warrant here." Ramos's attorney also concluded his rebuttal argument by again explaining "that the tow was not required and that it was nothing more than a pretext to search [t]his vehicle illegally." While Ramos did not cite to *Opperman* or *Caniglia* below, she was within her purview to refine her argument for appeal, provided that her stance on the issue remained the same. We conclude her argument has not changed. Ramos argued below and on appeal that the officers used an impermissible pretext as a justification to impound and then search her car without a warrant. Accordingly, we will address the merits of Ramos's argument.

*2. An officer's decision to impound a car violates the Fourth Amendment when the primary purpose behind that decision is to search the car for evidence of criminal activity.*

We will next address whether a warrantless impoundment and subsequent inventory search of an automobile may be used as a pretext for an investigatory search. It is constitutionally impermissible to perform a warrantless impoundment and inventory search where the primary

purpose behind the decision to impound the car is to investigate the car for evidence of criminal activity.

The United States Supreme Court has stated that "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). The Court explained that "[t]he policy or practice governing inventory searches should be designed to produce an inventory." *Id.* "The individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime[.]'" *Id.* (quoting *Bertine*, 479 U.S. at 376 (Blackmun, J., concurring)).

The United States Supreme Court has also explained that the inventory searches it upheld were not the product of pretext. For example, in *Opperman*, the United States Supreme Court upheld an inventory search of an impounded automobile conducted pursuant to standard police procedure. 428 U.S. at 375–76. The Court explained in part that, "[a]s in *Cady*, there is no suggestion whatever that this standard procedure, essentially like that followed throughout the country, was a pretext concealing an investigatory police motive." *Id.* at 376 (citing *Cady v. Dombrowski*, 413 U.S. 433 (1973)). Additionally, in *Bertine*, the Court upheld an inventory search where "there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation." 479 U.S. at 372.

Likewise, this Court has explained that a pretextual impoundment of a vehicle in order to conduct an inventory search is unconstitutional. This Court has stated that "warrantless inventory searches, when conducted in compliance with standard and established police procedures *and not as a pretext for criminal investigation*, do not offend Fourth Amendment strictures against unreasonable searches and seizures." *Weaver*, 127 Idaho at 290, 900 P.2d at 198 (italics added) (multiple citations omitted). The Idaho Court of Appeals has also recognized this principle. *See, e.g.*, *Stewart*, 152 Idaho at 870, 276 P.3d at 742 (Ct. App. 2012) ("[A]n inventory search must not be a ruse for general rummaging in order to locate incriminating evidence.") (citing *Wells*, 495 U.S. at 3).

Thus, pursuant to precedent from the United States Supreme Court and the appellate courts of this state, it is constitutionally impermissible to perform a warrantless impoundment and inventory search as a pretext for an investigatory search. To that end, we hold that, where the "primary purpose" behind the decision to impound a car is for the police to perform an inventory

11

search in order to investigate their criminal suspicions, the impoundment and subsequent search violate the Fourth Amendment. *United States v. Grey*, 959 F.3d 1166, 1179 (9th Cir. 2020); *United States v. Johnson*, 889 F.3d 1120, 1126–28 (9th Cir. 2018); *United States v. Orozco*, 858 F.3d 1204, 1213 (9th Cir. 2017). Because the State must "prove the legality of the search[,]" the burden to show by a preponderance of the evidence that an investigative motive was not the primary purpose behind the decision to impound the defendant's car remains with the State. *Hoskins*, 165 Idaho at 221, 443 P.3d at 235 (quoting *Holland*, 135 Idaho at 162, 15 P.3d at 1170).

       3.   *The issue of whether the decision to impound Ramos's car was unconstitutional is remanded to the district court for it to analyze.*

The next question is whether the decision to impound the vehicle was reasonable in this case. Given our adoption of the "primary purpose" standard today, we leave the resolution of this question to the district court to determine in the first instance. However, we take this opportunity to provide guidance to the district court on remand. *Urrutia v. Blaine County*, 134 Idaho 353, 359, 2 P.3d 738, 744 (2000) ("Where an appellate court reverses or vacates a judgment upon an issue properly raised, and remands for further proceedings, it may give guidance for other issues on remand." (quoting *Price v. Payette Cnty. Bd. of Cnty. Comm'rs*, 131 Idaho 426, 431, 958 P.2d 583, 588 (1998))).

First, we note that the usual method of determining whether an officer's decision to impound a car is reasonable is to judge the officer's decision against an objective standard. *Weaver*, 127 Idaho at 291, 900 P.2d at 199. However, determining whether an officer's primary purpose in deciding to impound a car is an impermissible pretext will require the district court to consider evidence regarding the officer's *subjective* intent. Because of this variance from our usual standard, a remand is necessary for the district court to apply the appropriate standard of review.

Next, we emphasize that, even if the primary purpose behind the officer's decision to impound the car is not pretextual, the State must still prove that the decision to impound the car is reasonable under the circumstances. *Id.* at 290, 900 P.2d at 198. The decision to impound a vehicle and the subsequent inventory search of that vehicle serve different purposes. *Opperman*, 428 U.S. at 368–69. In *Opperman*, the United States Supreme Court explained that the decision to impound a vehicle must be "[i]n the interests of public safety and as part of what the Court has called 'community caretaking functions[.]'" *Id.* at 368 (internal citation omitted). In contrast, one of the purposes of conducting an inventory search is the State's responsibility, *once the vehicle is in police possession*, to protect "the owner's property while it remains in police custody[.]" *Id.* at

12

369. Thus, while the protection of the vehicle owner's property is a legitimate *concern* for law enforcement when performing the inventory search, such concern is not necessarily a valid *purpose* for deciding to impound the vehicle in the first place.

As explained, whether an impoundment is lawful, or reasonable under the circumstances, depends on if it constitutes "community caretaking" by law enforcement. *Opperman*, 428 U.S. at 368–69; *Weaver*, 127 Idaho at 290, 900 P.2d at 198. The *Opperman* Court specifically noted that when police "seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience[,]" such impoundments are "beyond challenge." 428 U.S. at 369. Although the *Opperman* Court did not indicate whether other reasons for impounding a vehicle existed, some courts have extended "community caretaking" to include impounding a vehicle to prevent theft or vandalism to the vehicle, while other courts have declined to do so. *Compare Miranda v. City of Cornelius*, 429 F.3d 858, 864 (9th Cir. 2005) ("Whether an impoundment is warranted under this community caretaking doctrine depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft."), *with United States v. Duguay*, 93 F.3d 346, 352 (7th Cir. 1996) ("The suggestion that the police were obliged to impound the vehicle 'to protect it' from theft or vandalism, strikes us as making up new police obligations after the fact where none existed before.").

Absent clear instruction from the United States Supreme Court, we decline to expand *Opperman*'s "community caretaking" rationale to include potential theft or property damage to the vehicle as an acceptable reason to impound a vehicle for two reasons. First, "[t]he community caretaking function does not allow officers to seize individuals where no serious harm is threatened merely on a belief that the individual's decisions or actions are unsound." *State v. Maddox*, 137 Idaho 821, 825, 54 P.3d 464, 468 (Ct. App. 2002). "Community caretaking justifies a detention only if there is a present need for assistance." *Id.* There is no such "present need for assistance" if the officer simply believes the car might be at risk of theft or damage. We agree with the Court of Appeals that

> [a]llowing officers to conduct community caretaking stops whenever they anticipate that a citizen might be about to embark upon an unwise venture would present far too great an opportunity for pretextual stops and far too great an imposition on the privacy interests of our citizenry to comport with the Fourth Amendment.

*Id.*

Second, expanding *Opperman's* "community caretaking" rationale to include potential theft or property damage to the car as an acceptable reason to impound that vehicle could open the door to tort liability for police officers. In general, "[n]o liability arises from the law of torts unless the defendant owes a duty to the plaintiff." *Udy v. Custer County*, 136 Idaho 386, 389, 34 P.3d 1069, 1072 (2001). However, "[t]his Court has recognized that it is possible to create a duty where one previously did not exist." *Id.* For example, in *Ransom v. Garden City*—a case in which we analyzed a negligent entrustment claim against a police officer—we held that a police officer created a duty. 113 Idaho 202, 207, 743 P.2d 70, 75 (1987). The police officer arrested the owner of a vehicle for driving under the influence of alcohol. *Id.* at 203, 743 P.2d at 71. The officer took the keys from the driver, becoming "the only person who had control over [the] vehicle." *Id.* at 207, 743 P.2d at 75. The officer then gave the keys to the passenger of the car, whom the officer had determined was also under the influence of alcohol but instructed the passenger not to drive the car. *Id.* at 203, 743 P.2d at 71. We held that the officer owed a duty of ordinary care in entrusting the keys and the vehicle to an inebriated third party. *Id.* at 207–08, 743 P.2d at 75–76.

Allowing officers the discretion to impound a vehicle based on a concern for potential theft and property damage to the vehicle is the first step in creating a duty where one did not previously exist—or, at the very least, it is the first step in opening the floodgates of litigation. Officers who considered but decided against impounding a car could face a lawsuit contending they were negligent. The threat of a lawsuit, even one without merit, would unnecessarily cloud the officer's judgment as to whether impounding a vehicle was reasonable under the Fourth Amendment. We cannot countenance unnecessarily subjecting officers to that sort of liability, particularly where *Opperman* does not demand it. Accordingly, an officer's concern that the car will be subject to theft or property damage if it is not impounded—no matter how well-founded the concern may be—is irrelevant to the analysis as to whether the decision to impound the car is reasonable under the Fourth Amendment.

In sum, with the guidance set forth above, we remand the case to the district court to determine whether the decision to impound Ramos's car passes constitutional muster.

## IV. CONCLUSION

For the foregoing reasons, we reverse the district court's denial of Ramos's motion to suppress and remand the case for further proceedings consistent with this opinion.

Chief Justice BEVAN and Justices BRODY, MOELLER and ZAHN CONCUR.